1 | Vanessa R. Waldref
2 | United States Attorney
3 | Eastern District of Washington
  | Dan Fruchter
4 | Tyler H.L. Tornabene
5 | Assistant United States Attorneys
  | David L. Gunn
6 | Senior Trial Attorney
7 | James J. Hennelly
  | Trial Attorney
8 | Department of Justice, Consumer Protection Branch
9 | Post Office Box 1494
  | Spokane, WA 99210-1494
10 | Telephone: (509) 353-2767

FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SEP 1 3 2022

SEAN F. MCAVOY, CLERK
_____, DEPUTY
YAKIMA, WASHINGTON

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| UNITED STATES OF AMERICA, | 1:22-CR- 2097-SAB |
|---|---|
| Plaintiff, | INDICTMENT |
| | Vio: 18 U.S.C. § 371 |
| v. | Conspiracy to Violate 21 U.S.C. §§ 331(a), 333(a)(2), 342(a)(1), (a)(3), (a)(4), (b)(3), and (b)(4) (Count 1) |
| MARY ANN BLIESNER, VALLEY PROCESSING, INC., | |
| Defendants. | 21 U.S.C. §§ 331(a), 333(a)(2), 342(a)(1), (a)(3), (a)(4), (b)(3), and (b)(4) Introducing Adulterated Food into Interstate Commerce (Counts 2 and 3) |
| | 21 U.S.C. §§ 331(dd), 333(a)(2) Failure to Register a Food Facility (Counts 4 and 5) |

INDICTMENT – 1

| | |
|---|---|
| 1 | 18 U.S.C. § 371 |
| 2 | Conspiracy to Defraud and Obstruct the Lawful |
| 3 | Regulatory Functions of the |
| 4 | Food and Drug Administration (Count 6) |
| 5 | |
| 6 | 18 U.S.C. § 1001 |
| 7 | False Statements (Counts 7 through 9) |
| 8 | |
| 9 | 18 U.S.C. §§ 1341 and 1349 |
| 10 | Conspiracy to Commit Mail Fraud |
| 11 | (Count 10) |
| 12 | |
| 13 | 18 U.S.C. § 1341 Mail Fraud |
| 14 | (Counts 11 and 12) |
| 15 | |
| 16 | 18 U.S.C. § 981, 18 U.S.C. § 982, 28 U.S.C. § 2461 |
| 17 | Forfeiture Allegations |

The Grand Jury charges:

### INTRODUCTION AND OVERVIEW

1.     Beginning no later than on or about October 29, 2012, and continuing until at least on or about June 20, 2019, Defendant, VALLEY PROCESSING, INC., a juice manufacturer, and one of its owners, Defendant, MARY ANN BLIESNER, together with co-conspirators both known and unknown to the grand jury, engaged in a scheme to defraud and conspiracy to violate federal food safety law and to introduce adulterated, misbranded, and unsafe fruit juice concentrate and other fruit products from Defendants' Sunnyside, Washington location into interstate commerce.  In this manner, and as described herein, Defendants unlawfully and fraudulently enriched themselves by selling hundreds of thousands

INDICTMENT – 2

of gallons of adulterated juice concentrate and other fruit products that they knew were unfit for human consumption and which endangered the safety of the public, including, as Defendants well knew, school children throughout the nation who consumed Defendants' juice products as part of free and reduced-cost school lunches.

2.     As part of Defendants' scheme, Defendants: violated food safety laws and regulations, falsified documentation and made materially false statements to customers and the U.S. Food and Drug Administration (FDA); concealed material information from customers and the FDA; with the intention to defraud and mislead; concealed from the FDA unsafe and insanitary food facilities used to store fruit juice products by failing to register the food facilities with the FDA as required by federal food safety laws; willfully and intentionally obstructed the FDA's lawful inspection and regulation of Defendants' production facilities; and defrauded and misled customers by supplying adulterated and unsafe fruit juice products to customers, including customers whom Defendants knew were using those products to make juice used in the United States Department of Agriculture's (USDA) School Lunch Program.

3.     Defendants' violations of food safety laws were not mere technical violations, but were knowing, egregious, and endangered the public.  Defendants used moldy, fermented, rotten, and otherwise adulterated juice product containing mold, animal excrement, insect and rodent remains, rusted metal, and other contaminants to manufacture fruit juice, fruit juice concentrate, and other products, which it then sold and shipped to customers in interstate commerce.  To hide the age, contamination, adulteration, inferiority, and poor quality of its products, Defendants frequently "blended" or "reworked" these adulterated, inferior, and contaminated products with newer product, and then assigned a new lot number and production date to the resulting product.  Defendants fraudulently sold and

INDICTMENT – 3

shipped the resulting product to unsuspecting customers as newly produced product. In this manner, rather than dispose of unusable product that was multiple years old, adulterated, rotten, moldy, and contaminated, Defendants monetized the product and avoided disposal costs, as well as the significant costs of properly processing and storing their products.

4.     By executing their scheme and conspiracy over a multi-year period, Defendants obtained millions of dollars in revenue through cheating customers and endangering the public.

GENERAL ALLEGATIONS

5.     At all times relevant to this Indictment, Defendant VALLEY PROCESSING, INC. (hereinafter VALLEY PROCESSING or VPI) was a Washington corporation located and headquartered at 108 Blaine Avenue, Sunnyside, Washington, 98944 (hereinafter the Blaine Avenue Facility) in the Eastern District of Washington. VPI manufactured single-strength fruit juice and fruit juice concentrate, including apple, pear, and grape juice products for customers worldwide. VPI's customers included at least two customers that purchased significant quantities of products for use in the USDA's School Lunch Program.

6.     At times relevant to this Indictment, VPI's Blaine Avenue Facility included three manufacturing plants, known as "Plant 1," "Plant 2," and "Plant 3," an ambient conditions warehouse (known as the "Mojo Warehouse"), a cold room (the "Mojo Cold Room"), and freezers, office space, and other storage and facilities. In addition to the Blaine Avenue Facility, which was registered with the FDA, VPI also owned and operated juice product storage facilities located at 130 US Grape Road, Sunnyside, Washington (the "Grape Road Facility," also known as "the Hill") and a maintenance building at 105 South First Street, Sunnyside, Washington (the "Briner Building Facility"). As further set forth below, during

INDICTMENT – 4

time periods relevant to this Indictment, Defendants, with the intent to defraud and mislead the FDA, concealed the Grape Road Facility and the Briner Building Facility by, among other things, not registering these facilities with the FDA, to prevent the FDA from inspecting or regulating these facilities.

7.    At all times relevant to this Indictment, Defendant MARY ANN BLIESNER was a resident of the Eastern District of Washington and was the President and primary owner of VPI.  At some times relevant to this Indictment, Defendant MARY ANN BLIESNER held additional titles at VPI, including corporate Secretary and Treasurer.  At all times relevant to the Indictment, Defendant MARY ANN BLIESNER was knowledgeable of the purchase, receipt and storage of all fruit and raw materials at VPI, was knowledgeable of fruit production into juices, concentrates, and purées at VPI, was knowledgeable of the distribution of finished products from VPI, had overall responsibility for VPI's sales to customers, and oversaw all operations of VPI.

Relevant Food Safety Law

8.    The FDA is a federal agency of the U.S. Department of Health and Human Services responsible for, *inter alia*, protecting public health by ensuring the safety of the nation's food supply chain.  The Food, Drug, and Cosmetic Act (FDCA) vests primary responsibility for regulating and ensuring food safety in the United States in the FDA, which promulgates regulations, rules, and guidance, and conducts inspections, investigations, and audits regarding food safety.

9.    At all times relevant to this Indictment, 21 U.S.C. § 321(f) defined "food" as, *inter alia*, articles used for food or drink by humans or other animals, or components of such articles.

*Adulterated Food*

10.    Under 21 U.S.C. § 342, a food is considered "adulterated" if, *inter alia*:

INDICTMENT – 5

a. It contains any poisonous or deleterious substances which might render it injurious to health;

b. It consists, in whole or in part, of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food;

c. It has been prepared, packed, or held under insanitary conditions whereby it may have been rendered injurious to health;

d. Damage or inferiority has been concealed in any manner; or

e. Any substance has been added thereto or mixed or packed therewith so as to reduce its quality or strength, or make it appear better or of greater value than it is.

11.    The Food, Drug, and Cosmetic Act prohibits, and subjects a juice processor to criminal penalties, for introducing, delivering for introduction, or causing the introduction or delivery for introduction, of adulterated food into interstate commerce.  21 U.S.C. §§ 331(a), 333.

*Requirement for CGMP and HACCP Plans*

12.    Federal food current good manufacturing practice (CGMP) regulations establish basic practices required to be followed, and conditions required to be maintained, by entities or individuals who receive, prepare, process, pack, hold, or distribute human food, including juice.  21 C.F.R. Part 117, Subpart B.  The purpose of CGMP is to ensure that food, including juice, is processed in a safe and sanitary manner and to prevent its adulteration.  21 C.F.R. § 120.5.

13.    Juice processors are required to monitor, with sufficient frequency, their sanitation conditions and practices used during processing and storage to ensure, at a minimum, that they conform with CGMP regulations for manufacturing, packing, and holding human food.  *See, e.g.,* 21 C.F.R. Part 117, subpart B, 21 C.F.R. § 120.6(b).  Juice processors are required to comply with CGMP to ensure that their facilities, methods, practices, and controls used to

INDICTMENT – 6

process and store juice are sanitary and safe and to prevent the adulteration of their juice products.  21 C.F.R. § 120.5; 21 C.F.R. Part 117, Subpart B.  For example:

a.    21 C.F.R. § 117.35(a) requires that buildings, fixtures, and other physical facilities of the plant must be maintained in a clean and sanitary condition and must be kept in repair adequate to prevent food from becoming adulterated.

b.    21 C.F.R. § 117.35(c) requires that pests, including any objectionable animals or insects including birds, rodents, flies, and larvae, not be allowed in any area of a food plant, and that juice processors take effective measures to exclude pests from the manufacturing, processing, packing, and holding areas and to protect against the contamination of food on the premises by pests.

c.    21 C.F.R. § 117.37 requires that every building or structure or parts thereof, used for or in connection with the manufacturing, processing, packing, or holding of human food, be equipped with adequate sanitary facilities and accommodations including water supply, toilet facilities for employees, and hand-washing facilities designed to ensure that an employee's hands are not a source of contamination of food, food-contact surfaces, or food-packaging materials.

14.    Juice storage and transportation are required to be under conditions that would protect against allergen cross-contact, as well as biological, chemical, and physical contamination of food, as well as against deterioration of the food and the container.  21 C.F.R. § 117.93.

15.    Manufacturers, such as VPI, that process juice products that are sold as juice or are used as an ingredient in beverages are also subject to the juice Hazard Analysis and Critical Control Point (HACCP) regulations of 21 C.F.R. Part 120.  21 C.F.R. §§ 120.1 and 120.3(i)(1).  "Juice" means the aqueous liquid

INDICTMENT – 7

expressed or extracted from one or more fruits or vegetables, purées of the edible portions of one or more fruits or vegetables, or any concentrates of such liquid or purée. The purpose of HACCP regulations and plans is to prevent the occurrence of potential food hazards in, or adulteration of, the juice. HACCP achieves this goal by requiring juice processors to assess their processing operations (known as the hazard analysis), identify points in the process at which various hazards may occur (known as critical control points), and establish measures to control, prevent, or eliminate those hazards (known as critical limits). *See* 21 C.F.R. §§ 120.7-120.13. The failure of a processor to have and to implement a Hazard Analysis and Critical Control Point (HACCP) system that complied with 21 C.F.R. §§ 120.6, 120.7, and 120.8, or otherwise to operate in accordance with 21 C.F.R. Part 120, renders the juice products of that processor adulterated under 21 U.S.C. § 342(a)(4). 21 C.F.R. § 120.9.

16.    Under the juice HACCP regulations, each juice processor, including VPI, is required to develop a written hazard analysis to determine whether there are food hazards reasonably likely to occur during processing for each type of juice produced and to identify control measures that the processor can apply to control those hazards. 21 C.F.R. § 120.7(a). Whenever a hazard analysis identifies one or more food hazards that are reasonably likely to occur during processing, the processor is required to have and implement a written HACCP plan to control the identified food hazards. 21 C.F.R. § 120.8.

17.    Additionally, a juice processor's HACCP plan must identify "critical control points" (CCPs) in the juice manufacturing process at which a control measure can be applied that is essential to reduce an identified food hazard to an acceptable limit. 21 C.F.R. §§ 120.3(d), 120.7(a)(5).

18.    For each CCP, the HACCP plan must establish a "critical limit" *i.e.,* the "maximum or minimum value to which a physical, biological, or chemical

INDICTMENT – 8

parameter must be controlled . . . to prevent, eliminate, or reduce to an acceptable level, the occurrence of the identified food hazard." 21 C.F.R. §§ 120.3(e), 120.8(b)(3).

19.    The juice HACCP regulation further requires that juice processors have and implement a sanitation standard operating procedure that addresses sanitation conditions and practices before, during, and after processing, in each location where juice is processed.  21 C.F.R. §§ 120.6, 120.8(a)(1).

20.    Because a juice processor is required to follow CGMP, HACCP regulations, and HACCP plans in order to ensure that its products are safe, fit for human consumption, and processed, packed, and held in sanitary conditions, juice products that are processed, packed, or held out of compliance with CGMP requirements, HACCP regulations, or a processor's HACCP plan are, by definition, processed, packed, or held in insanitary conditions (and therefore are adulterated) within the meaning of 21 U.S.C. § 342(a)(4).

21.    Similarly, juice products are adulterated if the manufacturer's quality control operations fail to ensure that food is safe or suitable for human consumption.  *See* 21 C.F.R. § 117.1(a)(1)(ii), 117.80(a)(2).

*Misbranded Food*

22.    At all times relevant to this Indictment, pursuant to 21 U.S.C. § 321(k), a "label" was a display of written, printed, or graphic matter upon any article or any of its containers or wrappers or accompanying such article. "Accompanying" an article does not require physical attachment to the article and includes electronic graphic matter.  Moreover, if the article and the information are part of an integrated distribution program, and the information is textually related to the article, the information is labeling.

23.    Pursuant to 21 U.S.C. § 343, a food is "misbranded" if, *inter alia*, its labeling or packaging is false or misleading.

INDICTMENT – 9

24.    The Food, Drug, and Cosmetic Act prohibits, and subjects a juice processor to criminal penalties, for introducing, delivering for introduction, or causing the introduction or delivery for introduction, of misbranded food into interstate commerce.  21 U.S.C. §§ 331(a), 333(a).

*Requirement to Register a Food Facility with FDA*

25.    At all times relevant to this Indictment, pursuant to 21 U.S.C. § 350d, the owner of any domestic facility where food was manufactured, processed, packed, stored, or held was required to register and bi-annually re-register with the FDA the name and address of each such facility.  Among the purposes of the registration requirement is so that FDA can appropriately identify, regulate and, as necessary, inspect or audit each such facility to ensure it is compliant with food safety law.

26.    The Food, Drug, and Cosmetic Act prohibits, and subjects a juice processor to criminal penalties for, failing to register a food facility with the FDA. 21 U.S.C. §§ 350d, 331(dd), 333(a).

*Contaminants in Fruit Juice*

27.    Arsenic is a heavy metal that occurs in the environment from both natural and human-made sources, including in soils, rocks, volcanic eruptions, contamination from mining and smelting ores, and pesticides. Arsenic may occur in both inorganic and organic forms, and inorganic arsenic is generally more toxic than organic arsenic.  Inorganic arsenic has been known to cause cancer, skin lesions, cardiovascular disease, neurotoxicity, diabetes, and other conditions in humans.  Inorganic arsenic is a potential hazard for apple and pear juice products. Because arsenic is a heavy metal, thermal processing, such as pasteurization, does not destroy or reduce the amount of arsenic in juice or juice products. Pasteurization is a heat treatment in which food is heated for a specified time to temperatures below boiling point to reduce certain microorganisms.

28.     Patulin is a mycotoxin produced by certain species of molds that may grow on a variety of foods, including apples and pears.  Moldy, decaying, or damaged apples and pears are particularly susceptible to having high levels of patulin and patulin-producing molds.  If fallen fruit, moldy, rotten, bruised, or improperly stored apples are used to make juice, the juice may have high levels of patulin. Thermal processing, such as pasteurization, does not destroy or reduce the amount of patulin in juice or juice products.  While patulin is not reduced or eliminated by pasteurization, it can be destroyed by fermentation. Accordingly, patulin is generally not found in alcoholic beverages such as hard ciders or in vinegar products made from apple or pear juices.

29.     Exposure to high patulin levels over time may pose health hazards in humans, including nausea, vomiting, and gastrointestinal disturbances, as well as immunological and neurological effects.  FDA has established an action level for patulin of 50 parts per billion (ppb) in apple juice.

30.     Other potential hazards in juice and juice products include yeast, mold, bacteria (*e.g.*, *e. coli*), viruses (*e.g.*, norovirus), and other parasites (*e.g.*, the protozoa parasite *cryptosporidium parvum*) (hereinafter microorganisms). Microorganisms may cause a host of health issues, from food poisoning to, in some cases, long-term reactive arthritis or other types of severe chronic illness.  Some harmful microorganisms can survive and thrive in acidic juices such as grape juice. While thermal treatment such as pasteurization is a process used to reduce harmful microorganisms from appropriately stored and processed juice, it is not a sterilizing process and cannot be counted on to kill all microorganisms, nor can it be used to "rescue" (*i.e.*, render fit for human consumption) juice that has not been properly processed or stored or to make adulterated juice products non-adulterated or safe for human consumption.

31.    In addition to naturally occurring microorganisms, other harmful substances can be introduced during juice processing and storage in a variety of ways.  For example, tobacco use by employees, pests such as rodents and insects, bird feathers and droppings, insect larvae, snails and slugs, the use of food equipment for non-food purposes, and lack of, or failure to follow, sanitation practices may all contribute to the introduction of potentially harmful contaminants into juice.  While some of these contaminants may be reduced through pasteurizing (or re-pasteurizing) juice, others cannot be reduced.  Pasteurizing juice is not a replacement for following food safety laws, HACCP plans, or CGMP, but rather one component of them.

The USDA School Lunch Program

32.    The USDA's School Lunch Program (sometimes referred to as the National School Lunch Program or NSLP) is the nation's second-largest food and nutritional assistance program.  The School Lunch Program provides free or reduced-cost lunch to over 20 million children each school day.  USDA's research indicates that children from food-insecure and marginally food-secure households are more likely to eat School Lunch Program meals, and they receive more of their food and nutrient intake from school meals than other children.  For many food-insecure or marginally food-secure children, meals provided by the School Lunch Program are frequently their primary and most reliable sources of nutrition.

## COUNT 1

33.    The allegations in paragraphs 1 through 32 of this Indictment are incorporated as though realleged herein.

34.    Beginning on a date unknown to the grand jury but no later than October 29, 2012, and continuing until a date unknown to the grand jury but until at least June 20, 2019, in the Eastern District of Washington and elsewhere, Defendants, MARY ANN BLIESNER and VALLEY PROCESSING, INC.,

together with other persons known and unknown to the grand jury, knowingly and willfully conspired and agreed to introduce into interstate commerce, with the intent to defraud and mislead, adulterated and misbranded food in violation of 21 U.S.C. § 331(a), 333(a)(2), 342(a)(1), (a)(3), (a)(4), (b)(3), and (b)(4).

35.    It was the object of the conspiracy for Defendants and their known and unknown co-conspirators to unlawfully enrich themselves by manufacturing, selling, and shipping in interstate commerce, with the intent to defraud and mislead, adulterated juice concentrate and juice products to unsuspecting customers and consumers, including to customers for use in the USDA's School Lunch Program.

<u>Manner and Means of the Conspiracy</u>

36.    It was part of the conspiracy that Defendants and their known and unknown co-conspirators, and with the intent to defraud and mislead, knowingly, willfully, and intentionally failed to follow CGMP, food safety regulations, and HACCP requirements and regulations in their production and storage of fruit juice and fruit juice products, resulting in adulterated and misbranded juice products being sold and shipped in interstate commerce.

*Defendants' Blaine Avenue Facility*

37.    It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, stored thousands of metal and plastic drums of grape juice concentrate and other grape juice products in open air at ambient temperatures at and outside the Blaine Avenue Facility, sometimes for years.  As late as May 2018, some of these drums contained juice concentrate and juice products that had been produced as early as 2011 and were stored outside at ambient conditions and temperatures, rotting and fermenting for years.  Defendants nonetheless used these products to fill customer orders by either selling and shipping the product as-is, blending it with other product and fraudulently

INDICTMENT – 13

reassigning a new lot number and production date, or "reworking" old product by rehydrating, reprocessing, and re-pasteurizing it then fraudulently reassigning the "reworked" product with a new lot number and production date.

38.    During an FDA inspection of VPI in 2018, FDA investigators took the following photographs of grape juice concentrate stored by Defendants at Defendants' Blaine Avenue Facility, which show the adulterated grape juice concentrate stored by Defendants in thousands of 55-gallon drums:





39.   It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, willfully and intentionally sold and shipped in interstate commerce grape juice products that had been stored by Defendants and their known and unknown co-conspirators at the Blaine Avenue Facility in "cold storage" for many years, some of which had been originally processed by Defendants, and their known and unknown co-conspirators, as early as 2007.

40.   It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, held and stored the solid sediment tartrates that settled at the bottom of the drums of grape juice concentrate, sometimes referred to by Defendants and their known and unknown co-conspirators as grape "bottoms." Defendants removed the liquid concentrate from the drums, leaving the grape "bottoms" filling approximately one-fourth of the drum.  Rather than immediately reprocessing, disposing of, or properly storing the grape bottoms, Defendants and their known and unknown co-conspirators at times held grape "bottoms" for many

years at ambient temperatures and in insanitary conditions. Defendants and their known and unknown co-conspirators "reworked" the old, rotten, and moldy grape "bottoms" during periods of downtime at Defendants' facilities, such as in between harvest seasons. "Rework" involved adding water to the grape "bottoms," pumping the mixture from multiple drums of grape "bottoms" into a tank, and re-pasteurizing the mixture to make additional concentrate. Defendants and their known and unknown conspirators, with the intent to conceal the age, adulteration, and inferiority of the product, then fraudulently assigned a new lot number and production date corresponding to the date the grape "bottoms" were "reworked," rather than the original processing dates. Defendants fraudulently sold the resulting juice concentrate to customers as recently-produced product.

41.    During an FDA inspection of VPI in 2018, FDA investigators took the following photographs of grape "bottoms" stored by Defendants at the Blaine Avenue Facility, which shows the adulterated grape "bottoms" stored by Defendants in thousands of 55-gallon drums. These photos show apparent mold growth inside the plastic bags holding the grape "bottoms":





42.     Defendants' records reviewed by the FDA investigators show that between April 26, 2018, and April 30, 2018, the material from the above photographed 55-gallon drum was "reworked" along with multiple other grape bottoms also from production years 2011 to 2016, and which had also been stored outside at ambient temperatures by Defendants for years. The "reworked" material from the above pictured 55-gallon drum and others like it, was given a new lot code number of 050218-C6 which thereby made the "reworked" material to appear to be from production year 2018.

*Defendants' Unregistered and Fraudulently Concealed U.S. Grape Road Facility*

43.     It was further part of the conspiracy that, during the time period relevant to this Indictment, and beginning at least as early as October 29, 2012, Defendants and their known and unknown co-conspirators owned, operated, and used the Grape Road Facility, located at 130 U.S. Grape Road, Sunnyside, Washington, to house, hold, and store grape juice products including grape juice concentrate. The Grape Road Facility, which was located approximately three

INDICTMENT – 17

miles from the Blaine Avenue Facility, was sometimes referred to as "U.S. Grape," "Grape Road" or "the Hill."

44.    It was further part of the conspiracy that, while Defendants registered the Blaine Avenue Facility with the FDA, Defendants, and their known and unknown co-conspirators, with the intent to defraud and mislead the FDA, did not register the Grape Road Facility with the FDA as required by federal food safety laws.  Defendants, and their known and unknown conspirators, did not register, and affirmatively concealed, the Grape Road Facility because they knew that it contained grape concentrate that was unsafe and unfit for human consumption. Defendants sought to hide the Grape Road Facility from FDA to prevent FDA from inspecting or regulating it for compliance with food safety law and regulation.  It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, failed to follow CGMP and food safety law and regulation and never implemented a HACCP plan at the Grape Road Facility.

45.    It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, took affirmative steps to hide their storage and use of grape juice products at the Grape Road Facility from FDA and its personnel. These steps included: (1) during various FDA inspections in 2015-2016, 2017, and 2018, when questioned regarding facilities at which  Defendants were storing or processing fruit juice products, Defendants and their known and unknown co-conspirators, at Defendant MARY ANN BLIESNER's explicit direction, did not disclose any other such facilities; (2) when, in Spring 2018, FDA learned of the Grape Road Facility from confidential sources, Defendants MARY ANN BLIESNER and VALLEY PROCESSING, and their known and unknown co-conspirators, denied that the Grape Road Facility was being used to store grape juice product; (3) when, in Spring 2018, FDA indicated its intention to inspect the Grape Road Facility after learning of it from confidential sources, Defendants

INDICTMENT – 18

MARY ANN BLIESNER and VALLEY PROCESSING, and their known and unknown co-conspirators, instructed co-conspirators to place caution tape around the entrances to the facilities to make it appear as though the Grape Road Facility was not in use and that the building was structurally unsafe; (4) when, in Spring, 2018, FDA indicated its intention to inspect the Grape Road Facility after learning of its existence from confidential sources, Defendants MARY ANN BLIESNER and VALLEY PROCESSING, and their known and unknown co-conspirators told FDA investigators and instructed employees to tell FDA investigators that the facilities were unsafe to enter and that they contained no juice or juice products.

46.    It was further a part of the conspiracy that Defendants, and their known and unknown co-conspirators, kept earlier seasons' unsold grape juice concentrate in the Grape Road Facility, sometimes for many years.  Defendants stored product, including grape juice concentrate at the Grape Road Facility in: (1) a "cold room" used to store 55-gallon drums of grape juice concentrate; (2) a structure containing two refrigerated storage tanks referred to by Defendants as "USG1" and "USG2," each with an approximate capacity of 275,000 gallons; and (3) three 26,000-gallon capacity inadequately-covered concrete tanks, referred to by Defendants as G22, G23, and G24.  Tanks G22, G23, and G24 were not kept in a temperature-controlled or refrigerated location, but instead were open to the elements, and insufficiently cooled only by an air condenser that blew cool air across the top of the open 26,000 gallon storage tanks, which, at times, were partially covered by a plastic liner.

47.    Product stored and held at the unregistered and undisclosed Grape Road Facility was adulterated, noncompliant with food safety law and regulation, unsafe, and unfit for consumption because of the product's age and the conditions at the Grape Road Facility.  Product stored at the unregistered and undisclosed Grape Road Facility contained and consisted of fermented product as well as filthy,

putrid, and decomposed substances, including visible mold, animal urine and feces, and decomposing corpses of birds, rodents, and insects.  It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, nonetheless moved product from the unregistered and undisclosed Grape Road Facility to the Blaine Avenue Facility and blended it with newer and less contaminated product to hide its age, adulteration and unsuitability for consumption.  Defendants and their known and unknown co-conspirators sold and shipped the blended and adulterated product to unsuspecting customers.

48.    During an FDA inspection of VPI in 2018, FDA investigators took the following photograph of a live rat in tank G24 at the Grape Road Facility, standing on top of the moldy and rotten juice concentrate, the top layer of which contained a layer of mold thick and hard enough for the rat to walk on.  This photograph was taken approximately two months after Defendants transferred over 105,000 pounds of grape juice concentrate from this same tank into 55-gallon drums to prepare a lot of grape juice concentrate for shipment and sale to customers in interstate commerce:



*Defendants' Unregistered and Fraudulently Concealed Briner Building Facility*

49.    It was further part of the conspiracy that, during the time period relevant to this Indictment, Defendants, and their known and unknown co-conspirators, owned, operated, and used another facility, the Briner Building Facility located at 105 South First Street, Sunnyside, Washington, to house, hold, and store fruit juice and fruit juice products.  The Briner Building primarily served as a maintenance building used to house maintenance supplies and equipment; however, Defendants and their known and unknown co-conspirators also used the Briner Building Facility to store and hold fruit juice products, including grape juice concentrate stored in 55-gallon drums.

50.    It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, did not register the Briner Building Facility with the FDA as required.  Defendants, and their known and unknown conspirators, with the intent to defraud and mislead, failed to register, and affirmatively concealed, the Briner Building Facility because they knew it did not meet the food safety laws and legal requirements as set forth in this Indictment.  Defendants intentionally hid from FDA the existence of the Briner Building Facility so that FDA could not inspect or regulate it.

51.    It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, stored drums of fruit juice products at the Briner Building Facility, for many years, in a room that had cooling units but which was not temperature controlled.  Defendant nonetheless willfully and knowingly used these products in filling orders and sold and shipped them in interstate commerce, either by selling and shipping them outright; by blending them with other, newer products and fraudulently reassigning them with a new lot number and production date corresponding to the later date on which the old product had been blended; or by "reworking" old product by rehydrating concentrate and then reprocessing and

INDICTMENT – 21

re-pasteurizing the product, and fraudulently reassigning them with a new lot number and production date corresponding to the later date on which the old product had been "reworked."

*False and Fraudulent Mislabeling, Documentation, and Sale to Customers*

52.     It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, sold and shipped the adulterated, insanitary, unfit, and unsafe juice products that had been produced, packed, stored, and held at the Blaine Avenue Facility, the unregistered and undisclosed Grape Road Facility, and the unregistered and undisclosed Briner Building Facility, in violation of food safety laws and regulations, HACCP requirements, and CGMP, to unsuspecting customers, including for use in the USDA's School Lunch Program. Defendants did not inform their customers that the products customers were purchasing contained adulterated and misbranded product that incorporated concentrate from the unregistered and undisclosed Grape Road Facility or the unregistered and undisclosed Briner Building Facility, as well as grape "bottoms" and other product improperly stored in and outside the Blaine Avenue Facility.

53.     It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, provided false Certificates of Analysis (CoAs) to customers to conceal the product's true age and contamination. The false CoAs included, *inter alia*: (1) false and fraudulent representations regarding the production date(s) of the product; (2) false and fraudulent representations regarding the quality, fitness, and suitability of the product; (3) false and fraudulent representations that testing for patulin had been conducted and was "pending," when in fact no testing was conducted; (4) false and fraudulent representations that patulin testing was "pending," when in fact Defendants had no intent to provide, and did not provide, the customer with further information about any patulin testing; (5) false and fraudulent representations that patulin test results were "<50

ppb"; that is, below the FDA action level for patulin of 50 parts per billion (ppb), when in fact patulin testing either was not conducted at all or was conducted and yielded results greater than 50 ppb; (6) false and fraudulent representations that arsenic test results were below FDA action levels when in fact arsenic testing either was not conducted at all, or was conducted and yielded results greater than the applicable action level; and (7) false and fraudulent representations that yeast test results (an indication of fermentation and spoilage and potentially unfit product) were below specifications when in fact testing yielded results greater than the applicable specification and far in excess of what was indicated on the CoA.

54.    It was further part of the conspiracy that Defendants, and their known and unknown co-conspirators, at times operated without HACCP plans; with inadequate plans; and in violation of their own HACCP plans, in violation of the legal requirement that they implement and follow HACCP plans for each product type and at each location at which Defendants held and stored juice products.  For example, Defendants, and their known and unknown co-conspirators, never implemented a HACCP plan for the Grape Road Facility, nor to produce juice using old grape "bottoms."

55.    Defendants, and their known and unknown co-conspirators, engaged in the conspiracy to fraudulently ship to unsuspecting customers adulterated and misbranded product that was unsafe, insanitary, and unfit for consumption because they did not want to "waste" (*i.e.*, not use) any product that they could monetize to generate revenue for Defendant VALLEY PROCESSING.  Defendants' products were shipped and sold to domestic and international customers, including for use in School Lunch Program meals primarily consumed by disadvantaged children in American public schools.

Overt Acts in Furtherance of the Conspiracy

56.    In furtherance of the conspiracy and to accomplish its purposes, Defendants, and their known and unknown co-conspirators, did commit, and cause to be committed, acts in the Eastern District of Washington and elsewhere, which included, without limitation, the following:

a.    From at least as early as May 2017 until at least December 2017, Defendants' known co-conspirator directed employees to falsify CoAs and violate food safety law by selling and shipping in interstate commerce adulterated and misbranded apple juice concentrate with CoAs accompanying the shipment which misrepresented the arsenic content, including, for example, the following shipments:

| DATE | DESCRIPTION OF PRODUCT | ARSENIC CONTENT AND LABELING | INTRODUCTION IN INTERSTATE COMMERCE |
|---|---|---|---|
| On or about July 20, 2017 | Bill of Lading number 38315, Purchase Order 2017-00-46846 – approximately 9,986.69 pounds of apple juice concentrate from Lot Number 062417-B3 | Test report dated 7/6/17 indicates total arsenic content is 12 ppb. CoA does not list arsenic content. | Shipped from the Eastern District of Washington to the Central District of California |
| On or about July 24, 2017 | Purchase Order 4500283236-2 – approximately 4,089 pounds of apple juice concentrate from Lot number 062217-C5 | Test report dated 7/6/17 indicates total arsenic content is 11 ppb. CoA does not list arsenic content. | Shipped from the Eastern District of Washington to the Central District of California |
| On or about July 25, 2017 | Bill of lading 38228, Purchase Order 005062, approximately 42,443.43 pounds of organic apple juice concentrate from Lot Number 062217-C5 | Test report dated 7/6/17 indicates total arsenic content is 11 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to Etobicoke, Ontario, Canada |
| On or about | Bill of lading 3842, Purchase Order 4518216164, approximately 2,920.84 | Test report dated 7/6/17 indicates total arsenic content is 11 | From the Eastern District of Washington to the |

INDICTMENT – 24

| August 1, 2017 | pounds of organic apple juice concentrate from Lot Number 062217-C5 | ppb. CoA does not list arsenic content. | Central District of California |
|---|---|---|---|
| On or about August 26, 2017 | Bill of lading 38721, Purchase Order 149567, approximately 2,825.76 pounds of apple juice concentrate from Lot Number 062217-C5 | Test report dated 7/6/17 indicates total arsenic content is 11 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Central District of California |
| On or about September 1, 2017 | Bill of lading 38727, Purchase Order 50360, approximately 2,496.67 pounds of apple juice concentrate from Lot Number 070617-C6 | Test report dated 7/20/17 indicates total arsenic content is 17 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Eastern District of Louisiana |
| On or about September 19, 2017 | Bill of lading 38681, Approximately 8114.18 pounds of apple juice concentrate from Lot Number 062217-C5 | Test report dated 7/6/17 indicates total arsenic content is 11 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to Chungbuk, South Korea |
| On or about October 19, 2017 | Bill of lading 39153, Purchase Order 38536, Approximately 281.62 pounds of apple juice concentrate from Lot Number 062217-C5 | Test report dated 7/6/17 indicates total arsenic content is 11 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Southern District of Ohio |
| On or about November 27, 2017 | Bill of lading 39520, approximately 9,986.69 pounds of apple juice concentrate from Lot Number 070617-C6 | Test report dated 7/20/17 indicates total arsenic content is 17 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Central District of California |
| On or about December 7, 2017 | Bill of lading number 39554, approximately 4,993.34 pounds of apple juice concentrate from Lot Number 070617-C5 | Test report dated 7/20/17 indicates total arsenic content is 16 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Northern District of Georgia |

| On or about December 22, 2017 | Bill of lading number 39713, Purchase Order 17-3142, approximately 28,161.60 pounds of apple juice concentrate from Lot Number 070617-C5 | Test report dated 7/20/17 indicates total arsenic content is 16 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the District of Kansas |
|---|---|---|---|

b.      From at least as early as July 30, 2017, until as late as August 2018, Defendants sold and shipped 19 lots of apple concentrate to a customer in the Central District of California.  Defendants produced the 19 lots by blending or reworking product from Lot Number 081916-C3, which Defendants originally produced in 2016.  Defendants did not test Lot Number 081916-C3 for arsenic until on or about August 27, 2018, at which time the results showed that the samples from Lot Number 081916-C3 contained 26 ppb total arsenic -- above the FDA action level of 10 ppb.

c.      From at least as early as approximately 2014 until at least March 2017, Defendants' known co-conspirator directed employees to falsify CoAs regarding patulin testing in apple juice products sold and shipped by VPI. The known co-conspirator directed employees to list patulin testing as "pending" when in fact no testing was conducted, when testing revealed patulin levels above the FDA action level of 50 ppb, or when Defendants never intended to provide, and did not provide, testing results to customers.  Defendants' known co-conspirator also directed employees to falsely list patulin results as "<50 ppb" when VPI had not performed patulin testing.  For example, the known co-conspirator directed employees to falsify CoAs for adulterated and misbranded products that Defendants shipped and sold in interstate commerce to customers in the following shipments:

| DATE | DESCRIPTION | PATULIN TESTING AND LABELING | SALE AND SHIPMENT IN INTERSTATE COMMERCE |
|---|---|---|---|
| On or about April 29, 2015 | Sales Order 29863, for 5,800 gallons of apple juice from Lot Number 042915-J4 | Analytical test report indicates patulin content of 190 ppb, above FDA action level. CoA lists patulin testing as "pending" | From the Eastern District of Washington to the Central District of California to a customer for use in the USDA's School Lunch Program |
| On or about May 1, 2015 | Sales Order 29866, for 5,800 gallons of apple juice from Lot Number 050115-J3 | Analytical test report indicates patulin content of ~550 ppb, above FDA action level. CoA lists patulin testing as "pending". | From the Eastern District of Washington to the Central District of California to a customer for use in the USDA's School Lunch Program |
| On or about January 11, 2016 | Sales Order 32764, for 5,800 gallons of apple juice from Lot Number 011116-J3 | Patulin testing not performed. CoA lists patulin testing as "<50 ppb" | From the Eastern District of Washington to a customer in the Central District of California for use in the USDA's School Lunch Program |

d.    From at least as early as the fall of 2012 until at least July 2018, Defendants, and their known and unknown co-conspirators, stored and instructed employees to store processed grape juice concentrate at the Grape Road Facility, including in three inadequately-covered concrete tanks (G22, G23, and G24) that were contaminated and adulterated with animal excrement, decaying insect and animals and animal body parts, mold, yeast, rot, and filth.

e.    From at least as early as October 29, 2012, until at least June 20, 2019, Defendants, and their known and unknown co-conspirators, stored and

INDICTMENT – 27

instructed employees to store processed grape juice concentrate and grape "bottoms" in 55-gallon drums stored for years at ambient temperatures and conditions outside the Blaine Avenue Facility, including on a concrete pad under a "carport" between two freezer buildings, and in other unprotected outdoor areas. The drums stored outside developed contamination in the form of yeast, mold, rot, and other deleterious substances, rendering them adulterated. Many of these drums were not properly sealed and were not fenced, enclosed, or otherwise protected from access by people, animals, or other contaminants. Some product in these drums was produced as early as 2011. From as early as fall 2012 until at least June 20, 2019, Defendants, and their known and unknown conspirators, instructed employees to "rework" or blend these juice products to fill orders and ship to customers in interstate commerce, thus concealing the age, adulteration, and inferior and unsafe condition of the product.

f.      From approximately 2014 until at least May 2019, Defendants, and their known and unknown co-conspirators, stored and instructed employees to store processed juice products in the Briner Building Facility for years in 55-gallon drums, which became and were contaminated and adulterated with yeast, mold, rot, and other deleterious substances, rendering them adulterated.

g.      Between at least the fall of 2012 and May 2018, Defendants, and their known and unknown co-conspirators, with the intent to defraud and mislead, failed to register and disclose, as required by law, and affirmatively concealed the Grape Road Facility from FDA. Defendants further failed to disclose the material fact that hundreds of thousands of gallons of adulterated grape juice concentrate were being held at the Grape Road Facility in unsafe and insanitary conditions, and intended ultimately to be sold, shipped, and used as human food.

h.      Between at least January 2013 and June 20, 2019, Defendants, and their known and unknown co-conspirators, routinely "blended" old, inferior, adulterated, and contaminated product, including, but not limited to, product stored at the Grape Road Facility, at and outside the Blaine Avenue Facility, and in the Briner Building Facility, with newer product to mask its age, contamination, adulteration, and poor quality.  The product stored at these locations was adulterated because it had high yeast, high mold, and high bacteria counts such that it was unsafe and unfit for human consumption.  Each time that Defendants blended this adulterated product with newer product, the resulting blended product became adulterated.  Defendants, with the intent to defraud and mislead, nonetheless sold and shipped in interstate commerce the adulterated product to unsuspecting customers, including for use in the USDA's School Lunch Program.  Defendants, and their known and unknown co-conspirators, with the intent to defraud and mislead, misbranded the "blended" products by assigning them lot numbers and production dates that corresponded to the blending date rather than the true, original date of production, to conceal the products' age, adulteration, and inferiority.

i.      On or about October 29, 2012, Defendants, and their known and unknown co-conspirators, drew grape juice concentrate from Crop Year 2012 from Tank C2 located at the Blaine Avenue Facility and transported it to Tank USG2 located at the Grape Road Facility for long term storage for later use in selling and shipping the concentrate as food in interstate commerce.  In this manner, Defendants, and their known and unknown co-conspirators, stored at least 115,043 gallons of grape juice concentrate from Crop Year 2012 in Tank USG2.

j.      In the fall of 2013, Defendants, and their known and unknown co-conspirators, drew grape juice concentrate from the Blaine Avenue Facility and transported it to Tank USG1 at the Grape Road Facility for long term storage with

INDICTMENT – 29

the intent to later sell and ship the concentrate as food in interstate commerce. In this manner, Defendants, and their known and unknown co-conspirators, stored at least 153,000 gallons of grape juice concentrate from Crop Year 2013 in Tank USG1.

k. Between fall 2012 and fall 2014, Defendants, and their known and unknown co-conspirators, transported tens of thousands of gallons of grape juice concentrate from Crop Years 2012, 2013, and 2014 to concrete tanks G22, G23, and G24, located at the Grape Road Facility, for holding and storage for eventual use in selling and shipping in interstate commerce the adulterated concentrate as human food.

l. Between fall 2012 and June 2018, Defendants, and their known and unknown co-conspirators, stored hundreds of thousands of gallons of grape juice concentrate from Crop Years 2012, 2013, and 2014 at the Grape Road Facility in Tanks USG1, USG2, G22, G23, and G24, for the purpose of eventually selling and shipping in interstate commerce the adulterated concentrate as human food.

m. Between at least 2014 and until at least June 20, 2019, Defendants, and their known and unknown co-conspirators, instructed employees not to dispose of contaminated, adulterated, moldy, old, rotten, or unfit processed juice products, regardless of the condition of the product. Instead, Defendants, and their known and unknown co-conspirators, directed employees to store old, moldy, rotten, contaminated, putrid, filthy adulterated, and unsafe product for eventual "rework," re-pasteurization, or "blending."

n. Starting at a date unknown but between at least fall 2012 and May 2018, Defendants, and their known and unknown co-conspirators, held and stored product at the Grape Road Facility with no HACCP plan and little, if any, sanitation whatsoever. FDA testing confirmed that the Grape Road Facility and

product stored there was contaminated with live and dead rodents, birds, and insects. The open and exposed concrete tanks and the juice contained therein was contaminated with, among other things, thick mold, animal remains, rodent excreta pellets, other animal feces, and feathers.  The layer of mold and crust at the top of the grape juice concentrate was so thick and hard that FDA investigators observed a rodent walking across it.

        o.    On or about January 12, 2016, during an FDA inspection, Defendant MARY ANN BLIESNER falsely told FDA investigators that VALLEY PROCESSING consisted of three main processing plants numbered 1, 2, and 3, and several storage buildings and outside areas, all located at 108 Blaine Avenue, as well as three frozen storage buildings located nearby.  Defendant MARY ANN BLIESNER did not disclose, and affirmatively concealed, the Grape Road Facility and Briner Building as food storage areas, despite knowing at that time that Defendants were storing hundreds of thousands of gallons of grape juice concentrate at the Grape Road Facility.

        p.    Between at least 2013 and May 2019, Defendants, and their known and unknown co-conspirators, "reworked" and directed employees to "rework" old grape "bottoms" contaminated with mold and filth.  Many of these grape "bottoms" were stored in 55-gallon drums at ambient temperatures in unsafe conditions for multiple years.  Defendants, and their known and unknown co-conspirators, added water to the "bottoms," pumped the rehydrated "bottoms" out of the drums into a storage tank, and then decanted and re-pasteurized the resulting mixture.  This process produced additional adulterated and misbranded juice concentrate for Defendants to fraudulently sell.  Defendants then fraudulently assigned a new production date and lot number to the resulting product, to falsely make it appear as though it was new product and so that Defendants could sell the product to unsuspecting customers.

INDICTMENT – 31

1       q.      Between at least October 2012 and May 2019, Defendants, and

2   their known and unknown co-conspirators, assigned lot numbers to products and

3   their labels which reflected the date on which the product was produced and the

4   storage location at VPI's facilities.  For example, a lot of grape juice concentrate

5   produced on May 25, 2013, and stored in Tank C6 at the Blaine Avenue Facility

6   had a Lot Number 052513-C6.  Between at least January 2016 and May 2019,

7   Defendants, and their known and unknown co-conspirators, blended or "reworked"

8   old grape juice products into a new lot, fraudulently assigned a new lot number to

9   conceal the true age of the older lot used.  Defendants did not appropriately track

10  which lots were blended or reworked to create new lots, which prevented FDA

11  personnel, VPI, and third parties from tracing products to the original lots or

12  products from which they were derived.

13      r.      Between at least June 2014 and December 2017, Defendants,

14  and their known and unknown co-conspirators, instructed employees to provide

15  false and misleading CoAs to customers to conceal the true amount of yeast in

16  grape juice concentrate they sold.  For example, on or about June 2, 2014,

17  Defendants' test results for Lot 060214-C5 of grape juice concentrate showed a

18  yeast count of 700 colony forming units (CFU)/mL.  On or about June 13, 2014,

19  Defendants' test results for Lot 061314-C6 of grape juice concentrate showed a

20  yeast count of 210 CFU/mL.  However, Defendants' known co-conspirator

21  instructed employees to "list yeast as less than 100" to defraud and mislead

22  Defendants' customers.

23      s.      On or about the dates set forth below, Defendants, and their

24  known and unknown co-conspirators, shipped and directed employees to ship the

25  following Concord grape juice concentrate with false and fraudulent CoAs to

26  customers misrepresenting the yeast testing:

| Lot Code | Production Date | Shipping Date | Yeast Count Per Test Results | Result Defendants Fraudulently Listed on CoA |
|----------|----------------|---------------|------------------------------|----------------------------------------------|
| 070516-C6 | July 5, 2016 | July 5, 2016 | Too numerous to count (TNTC) | <1,000 CFU/mL |
| 040417-C1 | April 4, 2017 | April 5, 2017 | 2824 | Pending |
| 040517-20K | April 5, 2017 | April 6, 2017 | 2047 | Pending |
| 041017-20K | April 10, 2017 | April 11, 2017 | 1342, 1483 | Pending |

t.      Between on or about April 26, 2018, and April 30, 2018, Defendants MARY ANN BLIESNER and VALLEY PROCESSING INC., and their known and unknown co-conspirators, produced Lot Number 050218-C6 of Concord grape juice concentrate.  On or about May 2, 2018, Defendants and their known and unknown co-conspirators placed the resulting product into 240 55-gallon drums.   To produce Lot Number 050218-C6, Defendants MARY ANN BLIESNER and VALLEY PROCESSING INC., and their known and unknown co-conspirators, "reworked" hundreds of drums of grape "bottoms" from 22 different lot codes from production years 2011 through 2016, including, but not limited to, the following lot codes: 114 drums from Lot Number 080315-C5, produced on or about August 3, 2015; 40 drums from Lot Number 101414-C2, produced on or about October 14, 2014, and stored outside the Blaine Avenue Facility at ambient temperatures for approximately three and a half years; and four drums from 102712-C2, produced on or about October 27, 2012, and stored outside the Blaine Avenue Facility at ambient temperatures for approximately five and a half years.  On or about May 8, 2018, six days after Lot Number 050218-C6 was produced, FDA investigators took samples from what remained of three of the lots used to produce Lot Number 050218-C6.  Testing confirmed that the lots had fermentation-type odors, budding yeast, fungal mats, live mold, and insects.

Defendants MARY ANN BLIESNER and VALLEY PROCESSING INC., and their known and unknown co-conspirators, then fraudulently assigned a new production date of May 2, 2018, and a new lot number, 050218-C6, to conceal the age and poor quality of the product. Defendants MARY ANN BLIESNER and VALLEY PROCESSING INC., and their known and unknown co-conspirators, stored the resulting unsafe product in Cooler CA3, labeled it "Settling/Blending" to allow the adulterated product to settle and then blend it in with newer product to ship and send as grape juice concentrate.

u.    On or about March 5, 2018, and again on or about March 6, 2018, Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, transferred two tankers of grape juice from Crop Year 2012 containing approximately 105,100 pounds of grape juice concentrate from the Grape Road Facility to the Blaine Avenue Facility. Before transporting the grape juice concentrate, Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, had stored this grape juice concentrate for years in inadequately-covered concrete tank G24 at the Grape Road Facility. Defendants, VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators directed employees to "rework" this adulterated juice product by adding water and then re-concentrating it and placing it into approximately 144 55-gallon drums. Defendants, VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators did not filter, decant, or even re-pasteurize the grape juice concentrate before placing it into drums. Defendants, VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators then fraudulently reassigned these 144 drums with a production date of March 7, 2018, and a new Lot Number 030718-C2 to hide the age and adulteration of the product.

INDICTMENT – 34

Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, labeled the product "for blending" to further conceal the age and adulteration of the product and stored the drums outside the Blaine Avenue Facility at ambient temperatures and conditions for use in future grape juice concentrate lots.  Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, added the resulting product at Lot Number 030718-C2 to VALLEY PROCESSING's inventory database with a misleading and fraudulent production date of March 7, 2018, to conceal that the product was actually produced in 2012 and stored for years in an open-top concrete tank G24 at the Grape Road Facility.

v.    Just two months later, on or about May 9, 2018, after FDA learned of the Grape Road Facility, FDA investigators sampled the juice concentrate remaining in tank G24 at the Grape Road Facility, which had been stored for years in the same storage tank as the product that Defendants transferred to the Blaine Avenue Facility to make Lot Number 030718-C2.  FDA's testing confirmed that the concentrate in tank G24 contained fermentation, budding yeast, and filth, including rodent hair, dog and cat hair, a feather barbule, and decaying insects.  On or about May 16, 2018, FDA investigators confirmed through testing at least 29 rodent excreta pellets in the immediate surrounding areas adjacent to tank G24, which was partially covered by a tarp and otherwise exposed to the environment.

w.    On or about March 9, 2018, Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, created grape juice concentrate Lot Number 030918-C6 by blending:

    i.    80 drums of Concord grape juice concentrate, Lot Number 110117-20K, pasteurized and produced on or about November 1, 2017, and then subsequently stored outside the

Blaine Avenue Facility in ambient conditions for at least four months;

    ii.  8 drums of Concord grape juice concentrate, Lot Number 103017-C1, pasteurized and produced on or about October 20, 2017, and then subsequently stored outside the Blaine Avenue Facility in ambient conditions for at least four months; and

    iii.  Grape juice concentrate pumped from tank G18, which had been pasteurized and produced in 2015, and subsequently stored for approximately two and a half years.

Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, did not even re-pasteurize the adulterated blended product before placing it in drums and fraudulently assigned a production date of March 9, 2018, to hide the product's age, adulteration, and inferiority. On or about March 14, 2018, Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, sold and shipped resulting Lot Number 030918-C6 from the Eastern District of Washington to a juice company located in Ludington, Michigan, in the Western District of Michigan.

    x.    On or about April 30, 2018, during an FDA inspection, when FDA investigators asked where finished products were stored, Defendant MARY ANN BLIESNER described the storage locations at the Blaine Avenue Facility and stated that all of VALLEY PROCESSING's juice products were stored "on-site," within two to three blocks of the Blaine Avenue Facility, and the buildings were "all connected". Defendant MARY ANN BLIESNER made these false and fraudulent statements to conceal from FDA the Grape Road Facility.

INDICTMENT – 36

y.      On or about May 2, 2018, during an FDA inspection, when FDA
investigators asked Defendants VALLEY PROCESSING, INC. and MARY ANN
BLIESNER whether they were blending old, contaminated, or poor-quality
product, including product stored in drums outside the Blaine Avenue Facility,
with newer product and assigning new lot numbers to the blended product,
Defendant MARY ANN BLIESNER falsely and fraudulently stated, "We don't
use those; we haven't done that, no."  Defendant MARY ANN BLIESNER knew
her statements were false and made them with the intent to defraud and mislead
and obstruct the FDA's inspection.  In fact, at the time she made these statements,
Defendant MARY ANN BLIESNER knew that days before, Defendants VALLEY
PROCESSING, INC. and MARY ANN BLIESNER, and their known and
unknown co-conspirators, had blended old product stored outside the Blaine
Avenue Facility with other product to create a new lot number.

z.      On or about May 2, 2018, during an FDA inspection, when FDA
investigators, who had learned about the Grape Road Facility from confidential
sources, asked about the Grape Road Facility, Defendant MARY ANN
BLIESNER falsely and fraudulently stated, "I don't know anything about anything
up there."  Defendant MARY ANN BLIESNER further falsely and fraudulently
stated that the buildings at the Grape Road Facility were "unsafe," "off-limits,"
that it had been at least three years since it had been safe to enter the Grape Road
Facility buildings, and that they were "not going to be used."  Defendant MARY
ANN BLIESNER knew that these statements were false and made them to defraud
and mislead the FDA and obstruct the FDA's inspection.  Defendants VALLEY
PROCESSING, INC. and MARY ANN BLIESNER, and their known and
unknown co-conspirators, were, in fact, using the Grape Road Facility to store
product and were blending and reworking the product stored at the facility with

other product to conceal the age and inferiority of the product stored at the Grape Road Facility and with the intent to ship and sell the resulting adulterated product in interstate commerce.

aa.    On or about May 2, 2018, during an FDA inspection, Defendant MARY ANN BLIESNER falsely and fraudulently stated to FDA investigators, who had recently learned of the Grape Road Facility and were attempting to inspect it, "We are not going to use it [product stored at the Grape Road Facility]". Defendant MARY ANN BLIESNER did not disclose, and affirmatively concealed, that less than two months earlier, Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, transferred over 105,000 pounds of adulterated grape juice concentrate stored in concrete tank G24 at the Grape Road Facility to the Blaine Avenue Facility "rework" and blending with the intent to sell and ship the resulting adulterated product to customers, as alleged in Paragraphs 56(t) & (u).

bb.    On or about May 2, 2018, during an FDA inspection, Defendant MARY ANN BLIESNER instructed two known co-conspirators to place caution tape in and around the entrance and stairs leading to the concrete tanks G22, G23, and G24 at the Grape Road Facility in order to deter, prevent, and obstruct FDA investigators from accessing, observing, and sampling, those tanks and the fermented, moldy, rotten, insanitary, and adulterated product they contained as well as the filthy, putrid, and decomposed substances, including visible mold, animal urine and feces, and decomposing remains of birds, rodents, and insects, in and around those tanks.

cc.    On or about May 2, 2018, during an FDA inspection, Defendant MARY ANN BLIESNER falsely and fraudulently stated to FDA investigators that VALLEY PROCESSING did not use juice product that had been stored outside the

Blaine Avenue Facility in any products sold to customers.  On or about the same day, Defendant MARY ANN BLIESNER falsely and fraudulently stated to FDA investigators that juice products stored at the Grape Road Facility and outside the Blaine Avenue Facility were not listed in VALLEY PROCESSING's inventory system and therefore were not used to fill customer orders.

      dd.     On or about February 20, 2019, Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, directed employees to blend 109 drums of Concord grape concentrate, Lot Number 022019-20K, using 33 different lots to make the blended product, and fraudulently assigned a false production date of February 20, 2019.  At least 13 of the 33 lots used to make the blended product had a history of storage in 55-gallon drums outside the Blaine Avenue Facility in outdoor, ambient conditions.  Most of these 33 lots were last processed and placed in drums between 2015 and 2018.  Two of the 33 lots used to make Lot Number 022019-20K were last processed and placed in drums in September 2015, approximately three-and-a-half years earlier and were subsequently stored at the Grape Road Facility before Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, directed employees to use them to make Lot Number 022019-20K.  Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, did not even re-pasteurize the blended adulterated product prior to sale and shipment. Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, sold and shipped the blended product on or about March 22, 2019, March 29, 2019, April 12, 2019, and April 26, 2019, each such shipment being a separate overt act in furtherance of the conspiracy.

ee.    Between on or about May 6, 2019, and May 8, 2019, Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, directed employees to "rework" drums of grape "bottoms" from "consolidation lots" that were produced and placed into drums on four different dates between May 2015 and February 2019.  Each drum consisted of "bottoms" made from multiple lots with earlier production dates corresponding to the date on which the "consolidation lots" were placed into drums.  Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, blended the drums of grape "bottoms" with 148 drums of a lot of grape juice concentrate which Defendants had produced four and a half years before on or about October 20, 2014.  150 of the 152 drums that were blended to produce this new lot had a history of outdoor storage outside the Blaine Avenue Facility at ambient temperatures and conditions.  Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, and their known and unknown co-conspirators, fraudulently assigned the resulting lot with a production date of May 8, 2019, and a new lot number, 050819-C2, to hide the age, adulteration, and inferiority of the product.

All in violation of 18 U.S.C. § 371 and 21 U.S.C. §§ 331(a) 333(a)(2), 342(a)(1), (a)(3), (a)(4), (b)(3), and (b)(4).

## COUNTS 2-3

57.    Paragraphs 1 through 56 are hereby realleged and incorporated by reference as if set forth in full herein.

58.    On or about the dates set forth below, within the Eastern District of Washington and elsewhere, Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, with the intent to defraud and mislead, delivered for introduction, and caused the delivery for introduction, from the Eastern District of

Washington into interstate commerce, food, as described below, which was adulterated as defined in 21 U.S.C. § 342, in that:

    a. It had been prepared, packed, and held under insanitary conditions whereby it may have been rendered injurious to health;

    b. It consisted in part of filthy, putrid, and decomposed substances, and was otherwise unfit for food;

    c. Damage and inferiority had been concealed;

    d. It bore and contained deleterious substances, which might render it injurious to health; and

    e. Substances had been added thereto and mixed and packed therewith so as to make the juice appear better and of greater value than it was.

| COUNT | DATE | DESCRIPTION | INTRODUCTION IN INTERSTATE COMMERCE |
|---|---|---|---|
| 2 | On or about March 14, 2018 | Sales Order 40547, Purchase Order 82344, Invoice 40380 - one tanker consisting of approximately 4,394 gallons of grape juice concentrate, Lot Number 030918-C6, created on or about March 9, 2018 by blending together: (a) 80 55-gallon drums of Concord grape juice, lot number 110117-20K, pasteurized and produced on November 1, 2017, then stored outside the Blaine Avenue Facility; (b) 8 drums of Concord grape juice concentrate from lot number 103017-C1, pasteurized and produced on October 20, 2017, then stored outside the Blaine Avenue Facility; and (c) grape juice concentrate from tank G18, pasteurized and produced sometime in 2015.  Lot Number 030918-C6 was adulterated because (1) it was prepared, packed, or held under insanitary conditions | Shipped from the Eastern District of Washington to the Western District of Michigan |

INDICTMENT – 41

| | | whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; (2) it consisted in part of filthy, putrid, and decomposed substances, and was otherwise unfit for food; (3) it bore and contained deleterious substances, which might render it injurious to health; (4) its damage and inferiority were concealed; and (5) substances were added thereto and mixed and packed therewith so as to make it appear better and of greater value than it is, all in violation of 21 U.S.C. §§ 342(a)(1), (a)(3), (a)(4), (b)(3), and (b)(4). | |
|---|---|---|---|
| 3 | On or about March 13, 2018 | Sales Order 40528, Purchase Order 82343, Invoice 40375.  One tanker containing approximately 4,239 gallons of grape juice concentrate in Lot Number 030918-C6, created on or about March 9, 2018 by blending together: (a) 80 55-gallon drums of Concord grape juice, lot number 110117-20K, pasteurized and produced on November 1, 2017, then stored outside the Blaine Avenue Facility; (b) 8 drums of Concord grape juice concentrate from lot number 103017-C1, pasteurized and produced on October 20, 2017, then stored outside the Blaine Avenue Facility; and (c) grape juice concentrate from tank G18, pasteurized and produced sometime in 2015.  Lot Number 030918-C6 was adulterated because (1) it was prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; (2) it consisted in part of filthy, putrid, and decomposed substances, and was otherwise unfit for food; (3) it bore and contained deleterious substances, which | Shipped from the Eastern District of Washington to the Western District of Michigan |

| | | might render it injurious to health; (4) its damage and inferiority were concealed; and (5) substances were added thereto and mixed and packed therewith so as to make it appear better and of greater value than it is, all in violation of 21 U.S.C. §§ 342(a)(1), (a)(3), (a)(4), (b)(3), and (b)(4). | |
|---|---|---|---|

All in violation of 21 U.S.C. §§ 331(a), 333(a)(2), 342(a)(1), (a)(3), (a)(4), (b)(3), and (b)(4).

## COUNT 4

59.     Paragraphs 1 through 58 are hereby realleged and incorporated by reference as if set forth in full herein.

60.     Between no later than on or about October 29, 2012, and continuing through at least on or about May 2, 2018, within the Eastern District of Washington and elsewhere, Defendants MARY ANN BLIESNER and VALLEY PROCESSING, INC., with the intent to defraud and mislead, failed to register the food facility they operated at 130 U.S. Grape Road, Sunnyside, Washington (the Grape Road Facility) as required by 21 U.S.C. § 350d, in violation of 21 U.S.C. §§ 331(dd) and 333(a)(2).

## COUNT 5

61.     Paragraphs 1 through 60 are hereby realleged and incorporated by reference as if set forth in full herein.

62.     Between no later than on or about January 1, 2015, and continuing through at least on or about June 20, 2019, within the Eastern District of Washington and elsewhere, Defendants MARY ANN BLIESNER and VALLEY PROCESSING, INC., with the intent to defraud and mislead, failed to register the food facility they operated at 105 South First Street, Sunnyside, Washington (the

INDICTMENT – 43

Briner Building Facility), as required by 21 U.S.C. § 350d, in violation of 21 U.S.C. §§ 331(dd) and 333(a)(2).

## COUNT 6

63.     Paragraphs 1 through 62 are hereby realleged and incorporated by reference as if fully set forth herein.

64.     From on or about December 7, 2015, and continuing through on or about June 20, 2019, in the Eastern District of Washington and elsewhere, Defendants, MARY ANN BLIESNER and VALLEY PROCESSING., INC., and other persons both known and unknown to the grand jury, knowingly and willfully conspired and agreed together to defraud the United States of and concerning its government functions and rights, hereinafter described, that is:

(a) of and concerning its right to have its business and its affairs, and particularly the transaction of the official business of the FDA, conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment, and obstruction;

(b) of and concerning its right to have its officers and employees, and particularly the personnel of the FDA, free to transact the official business of the United States unhindered, unhampered, unobstructed, and unimpaired by the exertion upon them of dishonest, corrupt, unlawful, improper, and undue pressure and influence; and

(c) of and concerning its right and governmental function of the FDA through and by means of its officers and employees in the FDA to inspect, regulate, and transact official business with Defendants MARY ANN BLIESNER and VALLEY PROCESSING, INC. unhindered, unhampered, unobstructed, and unimpaired by the exertion upon such officers and employees of dishonest, unlawful, corrupt, improper, and undue pressure and influence.

INDICTMENT – 44

1

## Manner and Means of the Conspiracy

2      65.    Paragraphs 1 through 64 of this Indictment are hereby realleged and

3 incorporated by reference as if fully set forth herein.

4      66.    As further set forth in paragraphs 1 through 64 above, it was a part of

5 the conspiracy that Defendants would by deceit, craft, trickery and dishonest

6 means, to defraud the United States by interfering with and obstructing the lawful

7 governmental functions of the FDA, in that Defendants would:

8        a.  Fail to disclose and register, and knowingly conceal and deny the

9           existence of, Defendants' use of the Grape Road Facility to store

10          grape juice concentrate for years for the eventual sale and shipment

11          to customers;

12        b.  Fail to disclose and register, and knowingly conceal, the existence

13          and Defendants' use of the Briner Building Facility to store grape

14          juice concentrate for years for the eventual sale and shipment to

15          customers;

16        c.  Knowingly falsify CoAs to make it appear as though Defendants'

17          products complied with FDA standards and food safety law when

18          they did not;

19        d.  "Blend" and "rework" old, adulterated, unsafe, and unfit for

20          consumption product into other product, and then falsely and

21          fraudulently assign a new production date and Lot Number to hide

22          the older product's age and inferiority;

23         e.  Falsely and fraudulently deny during FDA inspections that product

24          stored outside the Blaine Avenue Facility in ambient conditions

25          was intended for eventual use in the processing, sale, and shipment

26          of juice products to customers, and instead falsely stated that the

27          product would not be used;

28

f.  Falsely and fraudulently deny during FDA inspections that the Grape Road Facility was being used to store product for eventual sale and shipment to customers;

g.  Make other false and fraudulent representations during FDA inspections regarding VALLEY PROCESSING INC.'s processes, practices, and procedures, in order to conceal Defendants' violation of food safety law and regulation, and Defendants' shipment and sale in interstate commerce of adulterated and misbranded food.

<u>Overt Acts in Furtherance of the Conspiracy</u>

67.    Paragraphs 1 through 66 of this Indictment are hereby realleged and incorporated by reference as if set forth in full herein.

68.    In furtherance of the conspiracy and to effect its objects, the overt acts included, without limitation, those set forth in Paragraph 56 and were committed in the Eastern District of Washington and elsewhere.

All in violation of 18 U.S.C. § 371.

<strong><u>COUNTS 7-9</u></strong>

69.    Paragraphs 1 through 68 are hereby realleged and incorporated by reference as if set forth in full herein.

70.    On or about the dates set forth below, in the Eastern District of Washington, Defendants MARY ANN BLIESNER and VALLEY PROCESSING, INC., did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, when in truth and fact, she knew all such statements to be false, when, to wit:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 7 | On or about April 30, 2018 | During an FDA inspection, when FDA investigators asked where finished products were stored, Defendants MARY ANN BLIESNER and VALLEY PROCESSING, INC. described the storage locations at the Blaine Avenue Facility and stated that all VALLEY PROCESSING INC.'s juice products were stored "on-site", within two to three blocks of the Blaine Avenue Facility, and was "all connected"; when in fact Defendants knew that Defendants were unsafely and improperly storing grape juice concentrate in significant quantities at the undisclosed and unregistered Grape Road Facility approximately three miles from the Blaine Avenue Facility as well as at the undisclosed and unregistered Briner Building. |
| 8 | On or about May 2, 2018 | During an FDA inspection, when FDA investigators asked Defendants whether they were blending old, contaminated, or poor-quality product, including product stored in drums outside the Blaine Avenue Facility, with newer product and producing new lot numbers with it, Defendants MARY ANN BLIESNER and VALLEY PROCESSING, INC. falsely and fraudulently stated, "We don't use those, we haven't done that, no"; when, in fact, Defendants knew that Defendants and their known and unknown co-conspirators were routinely blending old, contaminated, and poor-quality product, including product stored in drums at ambient conditions outside the Blaine Avenue Facility, with other product, and |

INDICTMENT – 47

| | | |
|---|---|---|
| | | fraudulently assigning false production dates and new lot numbers to the resulting product. |
| 9 | On or about May 2, 2018 | During an FDA inspection, when FDA investigators, who had learned about the Grape Road Facility from confidential sources, asked about the Grape Road Facility, Defendants MARY ANN BLIESNER and VALLEY PROCESSING, INC. falsely and fraudulently stated "I don't know anything about anything up there." Defendants MARY ANN BLIESNER and VALLEY PROCESSING, INC. further falsely and fraudulently stated that the buildings at the Grape Road Facility were "unsafe", "off-limits", and that it had been at least three years since it had been safe to enter the Grape Road Facility buildings. Defendants made these false and fraudulent statements about the Grape Road Facility when, in fact, Defendants knew that they, and their known and unknown co-conspirators, were actively using the undisclosed and unregistered Grape Road Facility to store product and, less than two months before, had transferred over 105,000 pounds of grape juice concentrate that had been stored at the Grape Road Facility in an insanitary and filth- and excrement- contaminated open-top tank for years to the Blaine Avenue facility for rework and blending into new production dates and lot numbers so that it could be sold and shipped to customers. |

all in violation of 18 U.S.C. § 1001(a)(2).

INDICTMENT – 48

## COUNT 10

71.    Paragraphs 1 through 70 of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

72.    Beginning no later than on or about October 29, 2012, and continuing until at least on or about June 20, 2019, in the Eastern District of Washington and elsewhere, Defendants VALLEY PROCESSING, INC., MARY ANN BLIESNER, and other persons both known and unknown to the grand jury, knowingly and willfully conspired and agreed together to devise and intended to devise a scheme and artifice to defraud customers and obtain money by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice and attempting to do so, deposited and caused to be deposited matters and things to be sent and delivered by private and commercial interstate carrier in violation of 18 U.S.C. § 1341.

### Object of the Conspiracy

73.    The object of the conspiracy was to, among other things, defraud Defendant VALLEY PROCESSING INC.'s customers and obtain money by means of false and fraudulent pretenses, representations, and promises concerning the age, quality, fitness, safety, adulteration, and suitability of Defendants' juice products and Defendants' compliance with food safety law.

### Manner and Means of the Conspiracy

74.    The manner and means of the conspiracy are set forth in Paragraphs 36 through 55 and incorporated by reference herein.  As alleged in Paragraphs 36 through 55, Defendants and other persons both known and unknown to the grand jury deposited, caused to be deposited, and attempted to deposit or cause to be deposited, adulterated, and misbranded juice products containing CoAs with false and fraudulent production dates to be sent and delivered by private and commercial

interstate carriers to customers outside Washington state.  All in violation of 18 U.S.C. §§ 1341 and 1349.

## COUNTS 11 and 12

75.    Paragraphs 1 through 74 of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

76.    On or about the dates set forth below, in the Eastern District of Washington and elsewhere, Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER, with the intent to defraud, devised and willfully participated in, with knowledge of its fraudulent nature, a scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises.

77.    For example, on or about the dates set forth below, in the Eastern District of Washington, for the purpose of executing and attempting to execute the above-referenced scheme to defraud, Defendants VALLEY PROCESSING, INC. and MARY ANN BLIESNER knowingly deposited and caused to be deposited matters and things, that is, CoAs with false and fraudulent production dates, CoAs and bills of lading, and adulterated fruit products, sent and delivered by private and commercial interstate carrier, that is, Idaho Milk, for the following lot numbers, each shipment constituting a separate count:

| Count | Date | Lot No. | Carrier | Destination |
|---|---|---|---|---|
| 11 | On or about March 13, 2018 | 030918-C6 | Idaho Milk | Western District of Michigan |
| 12 | On or about March 14, 2018 | 030918-C6 | Idaho Milk | Western District of Michigan |

All in violation of 18 U.S.C. § 1341.

INDICTMENT – 50

NOTICE OF FORFEITURE ALLEGATIONS

The allegations contained in this Indictment are hereby re-alleged and incorporated herein by this reference for the purpose of alleging forfeiture.

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of an offense(s) in violation of 18 U.S.C. §§ 1341, 1349, Conspiracy to Commit Mail Fraud, and/or 18 U.S.C. § 1341, Mail Fraud, as alleged in this Indictment, Defendants, MARY ANN BLIESNER and VALLEY PROCESSING, INC, shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s). The property sought for forfeiture includes, but is not limited to, the following:

MONEY JUDGMENT

A sum of money in United States currency, representing the amount of proceeds obtained by the Defendants from the mail fraud violations.

If any of the property described above, as the result of any act or omission of Defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

INDICTMENT – 51

Pursuant to 18 U.S.C. § 982(a)(7), upon conviction of an offense(s) in violation of 21 U.S.C. § 371, Conspiracy to Violate 21 U.S.C. § 331(a), and/or 21 U.S.C. § 331(a), Introducing Adulterated Food into Interstate Commerce, as alleged in this Indictment, and/or 21 U.S.C. § 331(dd), Failure to Register a Food Facility, Defendants, MARY ANN BLIESNER and VALLEY PROCESSING, INC, shall forfeit United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense(s).  The property sought for forfeiture includes, but is not limited to, the following:

MONEY JUDGMENT

A sum of money in United States currency, representing the amount of proceeds obtained by Defendants from the Introducing Adulterated Food into Interstate Commerce violations.

If any of the property described above, as the result of any act or omission of Defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21

//

//

//

U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), all pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c).

DATED this 13th day of September 2022.

A TRUE BILL

_____
Foreperson

_____
Vanessa R. Waldref
United States Attorney

_____
Dan Fruchter
Assistant United States Attorney

_____
Tyler H.L. Tornabene
Assistant United States Attorney

_____ for
David L. Gunn
Senior Trial Attorney, Civil Division, Consumer Protection Branch

_____
James J. Hennelly
Trial Attorney, Civil Division, Consumer Protection Branch

INDICTMENT – 53