Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Dan Fruchter
Devin C. Curda
Assistant United States Attorneys
James J. Hennelly
Trial Attorney
Department of Justice, Consumer Protection Branch
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Dec 17, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| UNITED STATES OF AMERICA, | Case No.: 1:22-CR-02097-SAB-1 |
|---|---|
| Plaintiff, | Plea Agreement |
| v. | |
| MARY ANN BLIESNER, | |
| Defendant. | |

Plaintiff United States of America, by and through Vanessa R. Waldref, United States Attorney the Eastern District of Washington, and Dan Fruchter and Devin C. Curda, Assistant United States Attorneys for the Eastern District of Washington, James J. Hennelly, Trial Attorney for the Department of Justice Consumer Protection Branch, and Defendant Mary Ann Bliesner ("Defendant"), both individually and by and through Defendant's counsel, Carl Oreskovich, agree to the following Plea Agreement.

1.    <u>Guilty Plea and Maximum Statutory Penalties</u>

Defendant agrees to enter a plea of guilty to: (i) Introducing Adulterated Food into Interstate Commerce in violation of 21 U.S.C. §§ 331(a), 333(a)(1), and

PLEA AGREEMENT - 1

342(a)(1), (a)(3), (a)(4), (b)(3) and (b)(4), a lesser included offense of Count 2 of the Indictment filed on September 13, 2022; and (ii) Failure to Register a Food Facility in violation of 21 U.S.C. §§ 331(dd), 333(a)(1) and 350d, a lesser included offense of Count 4 of the Indictment filed on September 13, 2022.  Defendant understands that these are Class A misdemeanors, each of which carries the following potential penalties:

        a.      a term of imprisonment of 1 year;

        b.      a term of supervised release of up to a year;

        c.      a fine of up to $250,000; and

        d.      a $25 special penalty assessment.

Defendant understands that if the Court imposes a sentence of probation in lieu of imprisonment, the term of probation may be up to 5 years.  Defendant understands that if Defendant violates any condition of probation, the Court may revoke probation and require Defendant to serve in prison a term up to the statutory maximum sentence set forth in this Plea Agreement.  Defendant understands that if Defendant violates probation and the Court imposes a custodial sentence, the Court may also impose a term of supervised release following incarceration that may be up to the statutory maximum term of supervised release authorized by statute for the offense or offenses of conviction, without credit for time previously served on probation or supervision.  Accordingly, Defendant understands that if Defendant violates one or more conditions of probation, Defendant could serve a total term of incarceration greater than the maximum sentence authorized by statute for Defendant's offense or offenses of conviction.

    2.    <u>Supervised Release</u>

    Defendant understands that if Defendant violates any condition of Defendant's supervised release, the Court may revoke Defendant's term of supervised release, and require Defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term

PLEA AGREEMENT - 2

of supervised release without credit for time previously served on post-release supervision.

Accordingly, Defendant understands that if Defendant commits one or more violations of supervised release, Defendant could serve a total term of incarceration greater than the maximum sentence authorized by statute for Defendant's offense or offenses of conviction.

3.     The Court is Not a Party to this Plea Agreement

The Court is not a party to this Plea Agreement and may accept or reject it. Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter.

Defendant understands the following:

      a.     sentencing is a matter solely within the discretion of the Court;

      b.     the Court is under no obligation to accept any recommendations made by the United States or Defendant;

      c.     the Court will obtain an independent report and sentencing recommendation from the United States Probation Office;

      d.     the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties;

      e.     the Court is required to consider the applicable range set forth in the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances; and

      f.     the Court may reject recommendations made by the United States or Defendant, and that will not be a basis for Defendant to withdraw from this Plea Agreement or Defendant's guilty plea.

4.     Potential Immigration Consequences of Guilty Plea

If Defendant is not a citizen of the United States, Defendant understands the following:

PLEA AGREEMENT - 3

     a.    pleading guilty in this case may have immigration consequences;

     b.    a broad range of federal crimes may result in Defendant's removal from the United States, including the offense to which Defendant is pleading guilty;

     c.    removal from the United States and other immigration consequences are the subject of separate proceedings; and

     d.    no one, including Defendant's attorney or the Court, can predict with absolute certainty the effect of a federal conviction on Defendant's immigration status.

Defendant affirms that Defendant is knowingly, intelligently, and voluntarily pleading guilty as set forth in this Plea Agreement, regardless of any immigration consequences that Defendant's guilty plea may entail.

    5.    <u>Waiver of Constitutional Rights</u>

Defendant understands that by entering this guilty plea, Defendant is knowingly and voluntarily waiving certain constitutional rights, including the following:

     a.    the right to a jury trial;

     b.    the right to see, hear and question the witnesses;

     c.    the right to remain silent at trial;

     d.    the right to testify at trial; and

     e.    the right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands that Defendant retains the right to be assisted by an attorney through the sentencing proceedings in this case and any direct appeal of Defendant's conviction and sentence, and that an attorney will be appointed at no cost if Defendant cannot afford to hire an attorney.

PLEA AGREEMENT - 4

1    Defendant understands and agrees that any defense motions currently
2    pending before the Court are mooted by this Plea Agreement, and Defendant
3    expressly waives Defendant's right to bring any additional pretrial motions.

4    6.    Elements of the Offense

5    The United States and Defendant agree that in order to convict Defendant of
6    Introducing Adulterated Food into Interstate commerce, in violation of 21 U.S.C.
7    §§ 331(a), 333(a)(1), and 342(a)(1), (a)(3), (a)(4), (b)(3), and (b)(4), the United
8    States would have to prove the following beyond a reasonable doubt.

9    *First,* Defendant held a position of responsibility at Valley
10   Processing, Inc. (VPI) and had the authority to prevent and correct the food
11   adulteration offense described herein;

12   *Second,* on or about March 14, 2018, VPI delivered for
13   introduction, and caused the delivery for introduction, from the Eastern
14   District of Washington into interstate commerce, food, to wit, approximately 4,394
15   gallons of grape juice concentrate;

16   c.    *Third,* the food was adulterated as defined in 21 U.S.C. § 342, in that:
17   (i) it had been prepared, packed, and held under insanitary conditions whereby it
18   may have been rendered injurious to health; (ii) it consisted in part of filthy, putrid,
19   and decomposed substances, and was otherwise unfit for food; (iii) damage and
20   inferiority had been concealed; (iv) it bore and contained deleterious substances,
21   which might render it injurious to health; (v) substances had been added thereto
22   and mixed and packed therewith so as to make the juice appear better and of
23   greater value than it was.

24   The United States and Defendant agree that in order to convict Defendant of
25   Failure to Register a Food Facility, in violation of in violation of
26   21 U.S.C. §§ 331(dd), 333(a)(1) and 350d, the United States would have to prove
27   the following beyond a reasonable doubt.

28

PLEA AGREEMENT - 5

a. *First*, beginning no later than October 29, 2012, and continuing through on or about May 2, 2018, in the Eastern District of Washington, Defendant operated a facility, located at 130 U.S. Grape Road, Sunnyside, Washington (the "Grape Road Facility,") in which food was held; and

b. *Second*, between on or about October 29, 2012 and May 2, 2018, Defendant failed to register the Grape Road Facility with the U.S. Food and Drug Administration as required;

7.   Factual Basis and Statement of Facts

The United States and Defendant stipulate and agree to the following: the facts set forth below are accurate; the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis for Defendant's guilty plea.

The United States and Defendant agree that this statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts that are relevant to the Sentencing Guidelines computation or sentencing, unless otherwise prohibited in this Plea Agreement.

### Defendant and VPI

At all relevant times, VPI was a Washington corporation located and headquartered at 108 Blaine Avenue, Sunnyside, Washington, 98944 (hereinafter the Blaine Avenue Facility) in the Eastern District of Washington.  VPI manufactured single-strength fruit juice and fruit juice concentrate, including apple, pear, and grape juice products for customers worldwide.  VPI's customers included at least two customers that purchased significant quantities of products for use in the USDA's School Lunch Program.

At all relevant times, VPI's Blaine Avenue Facility included three manufacturing plants, known as "Plant 1", "Plant 2", and "Plant 3", an ambient conditions warehouse (known as the "Mojo Warehouse"), a cold room (the "Mojo

PLEA AGREEMENT - 6

Cold Room"), and freezers, office space, and other storage and facilities. In addition to the Blaine Avenue Facility, which was registered with the FDA, VPI also owned and operated juice product storage facilities located at 130 US Grape Road, Sunnyside, Washington (the "Grape Road Facility," also known as "the Hill"). Between October 29, 2012 and May 2, 2018, neither Defendant nor VPI registered or disclosed the existence or use of the Grape Road Facility to the Food and Drug Administration (FDA), as was required.

At all relevant times, Defendant was a resident of the Eastern District of Washington and was the President and primary owner of VPI. Defendant was knowledgeable, or had the ability to become knowledgeable, of the purchase, receipt and storage of all fruit and raw materials at VPI, was knowledgeable, or had the ability to become knowledgeable, of fruit production into juices, concentrates, and purées at VPI, was knowledgeable, or had the ability to become knowledgeable, of the distribution of finished products from VPI, had overall responsibility for VPI's sales to customers, and oversaw all operations of VPI.

Relevant Food Safety Law

The FDA is a federal agency of the U.S. Department of Health and Human Services responsible for, *inter alia*, protecting public health by ensuring the safety of the nation's food supply chain. The Food, Drug, and Cosmetic Act (FDCA) vests primary responsibility for regulating and ensuring food safety in the United States in the FDA, which promulgates regulations, rules, and guidance, and conducts inspections, investigations, and audits regarding food safety.

At all relevant times, 21 U.S.C. § 321(f) defined "food" as, *inter alia*, articles used for food or drink by man or other animals, or components of such articles.

*Adulterated Food*

Under 21 U.S.C. § 342, a food is considered "adulterated" if, *inter alia*:

PLEA AGREEMENT - 7

a.  It contains any poisonous or deleterious substances which might render it injurious to health;

b.  It consists, in whole or in part, of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food;

c.  It has been prepared, packed, or held under insanitary conditions whereby it may have been rendered injurious to health;

d.  Damage or inferiority has been concealed in any manner; or

e.  Any substance has been added thereto or mixed or packed therewith so as to reduce its quality or strength, or make it appear better or of greater value than it is.

*Requirement for CGMP and HACCP Plans*

Federal food current good manufacturing practice (CGMP) regulations establish basic practices required to be followed, and conditions required to be maintained, by entities or individuals who receive, prepare, process, pack, hold, or distribute juice. 21 C.F.R. Part 117, Subpart B. The purpose of CGMP is to ensure that food, including juice, is processed in a safe and sanitary manner and to prevent its adulteration. 21 C.F.R. § 120.5.

Juice processors are required to monitor, with sufficient frequency, their sanitation conditions and practices used during processing and storage to ensure, at a minimum, that they conform with CGMP regulations for manufacturing, packing, and holding human food. *See, e.g.,* 21 C.F.R. Part 117, subpart B, 21 C.F.R. § 120.6(b). Juice processors are required to comply with CGMP in order to ensure that their facilities, methods, practices, and controls used to process and store juice are sanitary and safe and to prevent the adulteration of their juice products. 21 C.F.R. § 120.5; 21 C.F.R. Part 117, Subpart B. For example:

a.  21 C.F.R. § 117.35(a) requires that buildings, fixtures, and other physical facilities of the plant must be maintained in a clean and sanitary condition

PLEA AGREEMENT - 8

and must be kept in repair adequate to prevent food from becoming adulterated.

b. 21 C.F.R. § 117.35(c) requires that pests, including any objectionable animals or insects including birds, rodents, flies, and larvae, not be allowed in any area of a food plant, and that juice processors take effective measures to exclude pests from the manufacturing, processing, packing, and holding areas and to protect against the contamination of food on the premises by pests.

c. 21 C.F.R. § 117.37 requires that every building or structure or parts thereof, used for or in connection with the manufacturing, processing, packing, or holding of human food, be equipped with adequate sanitary facilities and accommodations including water supply, toilet facilities for employees, and hand-washing facilities designed to ensure that an employee's hands are not a source of contamination of food, food-contact surfaces, or food-packaging materials.

d. Juice storage and transportation are required to be under conditions that would protect against allergen cross-contact, as well as biological, chemical, and physical contamination of food, as well as against deterioration of the food and the container. 21 C.F.R. § 117.93.

Manufacturers, such as VPI, that process juice products that are sold as juice or are used as an ingredient in beverages are also subject to the juice Hazard Analysis and Critical Control Point (HACCP) regulations of 21 C.F.R. Part 120. 21 C.F.R. §§ 120.1 and 120.3(i)(1). "Juice" means the aqueous liquid expressed or extracted from one or more fruits or vegetables, purées of the edible portions of one or more fruits or vegetables, or any concentrates of such liquid or purée. The purpose of HACCP regulations and plans is to prevent the occurrence of potential food hazards in, or adulteration of, the juice. HACCP achieves this goal by requiring juice processors to assess their processing operations (known as the

hazard analysis), identify points in the process at which various hazards may occur (known as critical control points), and establish measures to control, prevent, or eliminate those hazards (known as critical limits). *See* 21 C.F.R. §§ 120.7-120.13. The failure of a processor to have and to implement a Hazard Analysis and Critical Control Point (HACCP) system that complied with 21 C.F.R. §§ 120.6, 120.7, and 120.8, or otherwise to operate in accordance with 21 C.F.R. Part 120, renders the juice products of that processor adulterated under 21 U.S.C. § 342(a)(4). 21 CFR § 120.9.

Under the juice HACCP regulations, each juice processor, including VPI, is required to develop a written hazard analysis to determine whether there are food hazards reasonably likely to occur during processing for each type of juice produced and to identify control measures that the processor can apply to control those hazards. 21 C.F.R. § 120.7(a). Whenever a hazard analysis identifies one or more food hazards that are reasonably likely to occur during processing, the processor is required to have and implement a written HACCP plan to control the identified food hazards. 21 C.F.R. § 120.8.

Additionally, a juice processor's HACCP plan has to identify "critical control points" ("CCPs") in the juice manufacturing process at which a control measure can be applied that is essential to reduce an identified food hazard to an acceptable limit. 21 C.F.R. § § 120.3(d), 120.7(a)(5).

For each CCP, the HACCP plan has to establish a "critical limit" *i.e.,* the "maximum or minimum value to which a physical, biological, or chemical parameter must be controlled . . . to prevent, eliminate, or reduce to an acceptable level, the occurrence of the identified food hazard." 21 C.F.R. §§ 120.3(e) 120.8(b)(3).

The juice HACCP regulation further requires that juice processors have and implement a sanitation standard operating procedure that addresses sanitation

PLEA AGREEMENT - 10

conditions and practices before, during, and after processing, in each location where juice is processed. 21 C.F.R. § 120.6, 120.8(a)(1).

Because a juice processor is required to follow CGMP, HACCP regulations, and HACCP plans in order to ensure that its products are safe, fit for human consumption, and processed, packed, and held in sanitary conditions, juice products that are processed, packed, or held out of compliance with CGMP requirements, HACCP regulations, or a processor's HACCP plan are, by definition, processed, packed, or held in insanitary conditions (and therefore are adulterated) within the meaning of 21 U.S.C. § 342(a)(4).

Similarly, juice products are adulterated if the manufacturer's quality control operations fail to ensure that food is safe or suitable for human consumption. *See* 21 C.F.R. § 117.1(a)(1)(ii); 21 C.F.R. § 117.80(a)(2).

*Requirement to Register a Food Facility with FDA*

Pursuant to 21 U.S.C. § 350d, the owner of any domestic facility where food was manufactured, processed, packed, stored, or held was required to register and bi-annually re-register with the FDA the name and address of each such facility. Among the purposes of the registration requirement is so that FDA can appropriately identify, regulate and, as necessary, inspect or audit each such facility to ensure it is compliant with food safety law.

The Food, Drug, and Cosmetic Act prohibits, and subjects a juice processor to criminal penalties for, failing to register a food facility with the FDA. 21 U.S.C. §§ 350d, 331(dd).

<u>The USDA School Lunch Program</u>

The USDA's School Lunch Program (sometimes referred to as the National School Lunch Program or NSLP) is the nation's second-largest food and nutritional assistance program. The School Lunch Program provides free or reduced-cost lunch to over 20 million children each school day. USDA's research indicates that children from food-insecure and marginally food-secure households

PLEA AGREEMENT - 11

1  are more likely to eat School Lunch Program meals, and they receive more of their
2  food and nutrient intake from school meals than other children.  For many food-
3  insecure or marginally food-secure children, meals provided by the School Lunch
4  Program are frequently their primary and most reliable sources of nutrition.

5              *Defendant's Unregistered U.S. Grape Road Facility*

6              Beginning at least as early as October 29, 2012, and continuing until at least
7  May 2, 2018, Defendant and VPI, owned, operated, and used the Grape Road
8  Facility, located at 130 U.S. Grape Road, Sunnyside, Washington, to house, hold,
9  and store grape juice products including grape juice concentrate.  The Grape Road
10 Facility, which was located approximately three miles from the Blaine Avenue
11 Facility, was sometimes referred to as "U.S. Grape," "Grape Road" or "the Hill."

12             While Defendant and VPI registered the Blaine Avenue Facility with the
13 FDA, Defendant did not register the Grape Road Facility with the FDA as required
14 by federal food safety laws.  VPI failed to follow CGMP and food safety law and
15 regulation and never implemented a HACCP plan at the Grape Road Facility.

16             Defendant and VPI kept earlier seasons' unsold grape juice concentrate in
17 the Grape Road Facility, sometimes for many years.  VPI stored product, including
18 grape juice concentrate at the Grape Road Facility in: (1) a "cold room" used to
19 store 55-gallon drums of grape juice concentrate; (2) a structure containing two
20 refrigerated storage tanks referred to as "USG1" and "USG2", each with an
21 approximate capacity of 275,000 gallons; and (3) three 26,000-gallon capacity
22 open-top concrete tanks, referred to as G22, G23, and G24.  Tanks G22, G23, and
23 G24 were not kept in a temperature-controlled or refrigerated location, but instead
24 were open to the elements, and insufficiently cooled only by an air condenser that
25 blew cool air across the top of the open 26,000-gallon storage tanks.

26             Product stored and held at the unregistered and undisclosed Grape Road
27 Facility was adulterated, noncompliant with food safety law and regulation, unsafe,
28 and unfit for consumption because of the product's age and the conditions at the

PLEA AGREEMENT - 12

Grape Road Facility.  Product stored at the unregistered and undisclosed Grape Road Facility contained and consisted of fermented product as well as filthy, putrid, and decomposed substances, including visible mold, animal urine and feces, and decomposing corpses of birds, rodents, and insects. During an FDA inspection of VPI in 2018, FDA inspectors took a photograph of a live rat in tank G24 at the Grape Road Facility, standing on top of the moldy and rotten juice concentrate, the top layer of which contained a layer of mold thick and hard enough for the rat to walk on.

*VPI's Shipment of Adulterated Grape Juice Concentrate*

In addition to storage at the Grape Road Facility, VPI stored grape juice concentrate in open air at ambient temperatures and uncontrolled conditions at and outside the Blaine Road Facility, sometimes for years.  VPI then used that product to fill customer orders by selling and shipping the product as it was; blending it with other product and assigning a new lot number and production date to the blended product that reflected the date of blending, not the date of production; or "reworking" old product by rehydrating, reprocessing, and re-pasteurizing it, and then reassigning the "reworked" product with a new lot number and production date that reflected the date of the "rework" rather than the original production date.

For example, on or about March 9, 2018, VPI created grape juice concentrate Lot Number 030918-C6 by blending together:

- 80 drums of Concord grape juice concentrate, Lot Number 110117-20K, pasteurized and produced on or about November 1, 2017, and then subsequently stored outside the Blaine Avenue Facility in ambient conditions for at least four months;
- 8 drums of Concord grape juice concentrate, Lot Number 103017-C1, pasteurized and produced on or about October 20, 2017, and then

PLEA AGREEMENT - 13

subsequently stored outside the Blaine Avenue Facility in ambient conditions for at least four months; and

- Grape juice concentrate pumped from tank G18, which had been pasteurized and produced in 2015, and subsequently stored for approximately two and a half years.

VPI did not re-pasteurize the adulterated blended product before placing it in drums and assigning a production date of March 9, 2018, which did not accurately reflect the true production date of the product. On or about March 14, 2018, Defendant and VPI sold and shipped resulting Lot Number 030918-C6 from the Eastern District of Washington to a juice company located in Ludington, Michigan, in the Western District of Michigan, for use in USDA's School Lunch Program. As President and primary owner of VPI who oversaw all operations at VPI, Defendant had the authority to prevent and correct the delivery of the adulterated product into interstate commerce.

Between 2016 and 2019, VPI received at least $742,139 in revenue from two VPI customers, Ludfords, Inc., and Indian Summer Cooperative, Inc., for adulterated grape juice concentrate.

8.    The United States' Agreements

The United States Attorney's Office for the Eastern District of Washington agrees that at the time of sentencing, the United States will move to dismiss the greater and remaining counts of the Indictment filed on September 13, 2022, which charge Defendant with Conspiracy, in violation of 18 U.S.C. § 371 (Counts 1 and 6); Introducing Adulterated Food into Interstate Commerce, in violation of 21 U.S.C. §§ 331(a), 333(a)(2), 342(a)(1), (a)(3), (a)(4), (b)(3), and (b) (Counts 2 and 3); Failure to Register a Food Facility, in violation of 21 U.S.C. §§ 331(dd), 333(a)(2) (Counts 4 and 5); False Statements, in violation of 18 U.S.C. § 1001(a)(2) (Counts 7 through 9); Conspiracy to Commit Mail Fraud, in violation

PLEA AGREEMENT - 14

of 18 U.S.C. §§ 1349, 1341 (Count 10); and Mail Fraud, in violation of 18 U.S.C. § 1341 (Counts 11 and 12).

The United States Attorney's Office for the Eastern District of Washington agrees not to bring additional charges against Defendant based on information in its possession at the time of this Plea Agreement that arise from conduct that is charged in the Indictment, unless Defendant breaches this Plea Agreement before sentencing.

9.    United States Sentencing Guidelines Calculations

Defendant understands and acknowledges that the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") apply and that the Court will determine Defendant's advisory range at the time of sentencing, pursuant to the Guidelines. The United States and Defendant agree to the following Guidelines calculations.

a.    Base Offense Level

The United States and the Defendant agree that the base offense level for both offenses is 6, and that the offenses group together. U.S.S.G. §§ 2N2.1(a) and (c); 2B1.1(a)(2); 3D1.2.

b.    Special Offense Characteristics

The United States and the Defendant have no agreement on whether any specific offense characteristics apply, and may each argue for or against any offense characteristics at Sentencing.

c.    Acceptance of Responsibility

The United States will recommend that Defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), if Defendant does the following:

      i.      accepts this Plea Agreement;

      ii.     enters a guilty plea at the first Court hearing that takes place after the United States offers this Plea Agreement;

PLEA AGREEMENT - 15

iii.     demonstrates recognition and affirmative acceptance of Defendant's personal responsibility for Defendant's criminal conduct;

iv.     provides complete and accurate information during the sentencing process; and

v.     does not commit any further obstructive conduct.

The United States and Defendant agree that at its option and on written notice to Defendant, the United States may elect not to recommend a reduction for acceptance of responsibility if, prior to the imposition of sentence, Defendant is charged with, or convicted of, any criminal offense, or if Defendant tests positive for any controlled substance.

d.    <u>No Other Agreements</u>

The United States and Defendant have no other agreements regarding the Guidelines or the application of any Guidelines enhancements, departures, or variances.  Defendant understands and acknowledges that the United States is free to make any sentencing arguments it sees fit, including arguments arising from Defendant's uncharged conduct, conduct set forth in charges that will be dismissed pursuant to this Agreement, and Defendant's relevant conduct.

e.    <u>Criminal History</u>

The United States and Defendant have no agreement and make no representations about Defendant's criminal history category, which will be determined by the Court after the United States Probation Office prepares and discloses a Presentence Investigative Report.

10.    <u>Incarceration</u>

The United States and Defendant agree to jointly recommend a sentence of 3 years of probation.  The United States and Defendant agree that the conditions of probation shall include the two special conditions set forth in Paragraph 11 below.

PLEA AGREEMENT - 16

11.  <u>Supervised Release</u>

The United States and Defendant agree to recommend 1 year of supervised release following any period of incarceration, if the Court imposes a period of incarceration.  Defendant agrees that the Court's decision regarding the conditions of Defendant's Supervised Release is final and non-appealable; that is, even if Defendant is unhappy with the conditions of Supervised Release ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or any term of Supervised Release.

The United States and Defendant agree to recommend that in addition to the standard conditions of supervised release imposed in all cases in this District, the Court should also impose the following conditions:

a.  The United States Probation Officer may conduct, upon reasonable suspicion, and with or without notice, a search of Defendant's person, residences, offices, vehicles, belongings, and areas under Defendant's exclusive or joint control.

b.  Defendant shall have no personal involvement, direct or indirect, in ordering; preparing; manufacturing; selling; or serving either food or beverages of any kind.

12.  <u>Criminal Fine</u>

The United States agrees to recommend no additional criminal fine. Defendant acknowledges that the Court's decision regarding a fine is final and non-appealable; that is, even if Defendant is unhappy with a fine ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or fine.

PLEA AGREEMENT - 17

13.   Forfeiture:

The parties agree forfeiture applies. *See* 21 U.S.C. §§ 334 and 853(p) by way of 21 U.S.C. § 331; 28 U.S.C. § 2461(c). With respect to forfeiture, the parties agree to the following:

(a)   Money Judgment

Defendant agrees to forfeit to the United States all right, title, and interest in the following property: a $742,139 money judgment payable at the time of sentencing, which represents the estimated amount of proceeds Defendant obtained as a result of her illegal conduct.  The United States and Defendant agree that this money judgment is joint and several with Defendant VPI.

(b)   Substitute Property

Defendant understands the United States may seek for Defendant to forfeit substitute property in satisfaction of the money judgment if the United States can establish the following regarding the above-described property (*i.e.*, the money judgment): a) it cannot be located upon the exercise of due diligence; b) it has been transferred or sold to, or deposited with, a third party; c) it has been placed beyond the Court's jurisdiction; d) it has substantially diminished in value; e) it has been commingled with other property and cannot be divided without difficulty. *See* 21 U.S.C. § 853(p). The United States will not seek to forfeit substitute property from other defendants or co-conspirators; it may only forfeit substitute property from Defendant.  *See* 21 U.S.C. § 853(p).

(c)   Cooperation on Forfeited Assets:

Defendant agrees to cooperate with the United States in passing clear title on all forfeited assets and to execute any and all forms and pleadings necessary to effectuate such forfeiture of assets.  Defendant also agrees to assist the United States in locating any assets that 1) are the proceeds of illegal conduct (as outlined in this Plea Agreement) and 2) have not been dissipated. If such assets are located, then Defendant will stipulate to their forfeiture.

PLEA AGREEMENT - 18

(d)    <u>Waivers:</u>

Defendant agrees to waive oral pronouncement of forfeiture at the time of sentencing. *See* Fed. R. Crim. P. 32.2(b)(4)(B).

Defendant stipulates and agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with the Plea Agreement on any grounds, including a claim that forfeiture in this case constitutes an excessive fine or punishment.

Defendant stipulates and agrees to hold the United States, and its agents and employees, harmless from any and all claims whatsoever in connection with the investigation, the prosecution of charges, and the seizure and forfeiture of property covered by this Plea Agreement.

(f)    <u>Non-Abatement of Criminal Forfeiture:</u>

Defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive her, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if Defendant had survived, and that determination shall be binding upon Defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed money judgment amount, is collected in full.

14.    <u>Mandatory Special Penalty Assessment</u>

Defendant agrees to pay the $50 mandatory special penalty assessment ($25 per count) to the Clerk of Court for the Eastern District of Washington, pursuant to 18 U.S.C. § 3013.

15.    <u>Restitution</u>

The United States and Defendant agree that no restitution is owing for any applicable victims.

PLEA AGREEMENT - 19

16.   <u>Payments While Incarcerated</u>

If Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, Defendant agrees to earn money toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

17.   <u>Additional Violations of Law Can Void Plea Agreement</u>

The United States and Defendant agree that the United States may, at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its sentencing recommendation if, prior to the imposition of sentence, Defendant is charged with or convicted of any criminal offense or tests positive for any controlled substance.

18.   <u>Waiver of Appeal Rights</u>

Defendant understands that Defendant has a limited right to appeal or challenge Defendant's conviction and the sentence imposed by the Court.

Defendant expressly waives all of Defendant's rights to appeal Defendant's conviction and the sentence the Court imposes.

Defendant expressly waives Defendant's right to appeal any fine, term of supervised release, forfeiture, or restitution order imposed by the Court.

Defendant expressly waives the right to file any post-conviction motion attacking Defendant's conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based on ineffective assistance of counsel arising from information not now known by Defendant and which, in the exercise of due diligence, Defendant could not know by the time the Court imposes sentence.

Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack upon the conviction or sentence, including, but not limited to, writ of habeas corpus proceedings brought pursuant to 28 U.S.C. § 2255.

19.    Compassionate Release

In consideration for the benefits Defendant is receiving under the terms of this Plea Agreement, Defendant expressly waives Defendant's right to bring any motion for Compassionate Release other than a motion arising from one of the specific bases set forth in this paragraph of this Plea Agreement. The United States retains the right to oppose, on any basis, any motion Defendant files for Compassionate Release.

The only bases on which Defendant may file a motion for Compassionate Release in the Eastern District of Washington are the following:

      a.    Medical Condition of Defendant

            i.    Defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia; or

            ii.    Defendant is suffering from a serious physical or medical condition, a serious functional or cognitive impairment, or deteriorating physical or mental health because of the aging process that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which Defendant is not expected to recover.

      b.    Age of Defendant

            i.    Defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process; and has served at least 10 years or

PLEA AGREEMENT - 21

75 percent of Defendant's term of imprisonment, whichever is less; or

    ii.    Defendant is at least 70 years old and has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which Defendant is imprisoned.

  c.  <u>Family Circumstances</u>

    i.    The caregiver of Defendant's minor child or children has died or become incapacitated, and Defendant is the only available caregiver for Defendant's minor child or children; or

    ii.    Defendant's spouse or registered partner has become incapacitated, and Defendant is the only available caregiver for Defendant's spouse or registered partner.

  d.  <u>Subsequent Reduction to Mandatory Sentence</u>

    i.    Defendant pleaded guilty to an offense which, on the date of Defendant's guilty plea, carried a mandatory minimum sentence; and

    ii.    after the entry of judgment, the length of the mandatory minimum sentence for Defendant's offense of conviction was reduced by a change in the law; and

    iii.    the application of the reduced mandatory minimum sentence would result in Defendant receiving a lower overall sentence.

  e.  <u>Ineffective Assistance of Counsel</u>

    i.    Defendant seeks Compassionate Release based on a claim of ineffective assistance of counsel arising from information that Defendant both

PLEA AGREEMENT - 22

        1.     did not know at the time of Defendant's guilty plea, and

        2.     could not have known, in the exercise of due diligence, at the time the Court imposed sentence.

20.    <u>Withdrawal or Vacatur of Defendant's Plea</u>

Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction be set aside, vacated, reversed, or dismissed under any circumstance, then:

     a.     this Plea Agreement shall become null and void;

     b.     the United States may prosecute Defendant on all available charges;

     c.     The United States may reinstate any counts that have been dismissed, have been superseded by the filing of another charging instrument, or were not charged because of this Plea Agreement; and

     d.     the United States may file any new charges that would otherwise be barred by this Plea Agreement.

The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

Defendant agrees to waive any objections, motions, and defenses Defendant might have to the United States' decision about how to proceed, including a claim that the United States has violated Double Jeopardy.

Defendant agrees not to raise any objections based on the passage of time, including but not limited to, alleged violations of any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

21.   <u>Waiver of Attorney Fees and Costs</u>

Defendant agrees to waive all rights Defendant may have under the "Hyde Amendment," Section 617, P.L. 105- 119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including, without limitation, any charges to be dismissed pursuant to this Plea Agreement or any charges previously dismissed or not brought as a result of this Plea Agreement).

22.   <u>Integration Clause</u>

The United States and Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and Defendant, and no other promises, agreements, or conditions exist between the United States and Defendant concerning the resolution of the case.

This Plea Agreement is binding only on the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state, or local authorities.

The United States and Defendant agree that this Agreement cannot be modified except in a writing that is signed by the United States and Defendant.

<u>Approvals and Signatures</u>

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Vanessa R. Waldref
United States Attorney

_____          12/17/24
Dan Fruchter                            _____
Assistant United States Attorney        Date

_____          _____
James J. Hennelly                       Date
Trial Attorney, Consumer Protection Branch

PLEA AGREEMENT - 24

I have read this Plea Agreement and I have carefully reviewed and discussed every part of this Plea Agreement with my attorney. I understand the terms of this Plea Agreement. I enter into this Plea Agreement knowingly, intelligently, and voluntarily. I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement. No one has threatened or forced me in any way to enter into this Plea Agreement. I agree to plead guilty because I am guilty.

_____          _12/17/24_
Mary Ann Bliesner                                 Date
Defendant

I have read the Plea Agreement and have discussed the contents of the agreement with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties. I concur in my client's decision to plead guilty as set forth in the Plea Agreement. There is no legal reason why the Court should not accept Defendant's guilty plea.

_____          _12/17/24_
Carl Oreskovich                                    Date
Attorney for Defendant

PLEA AGREEMENT - 25